UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
UNITED STATES OF AMERICA,                                        :
                                                                 :  MEMORANDUM AND ORDER
            -against-                                            :  13-cr-0150 (WFK) (JMA)
                                                                 :
MOHAMMAD AJMAL CHOUDHRY,                                         :
                                                                 :
                        Defendant.                               :
                                                                 :
-----------------------------------------------------------------X

**WILLIAM F. KUNTZ II, United States District Judge**

On February 26, 2013, Magistrate Judge Azrack held a bail hearing for Defendant Mohammad Ajmal Choudhry ("Defendant" or "Mr. Choudhry"). At the hearing, Magistrate Judge Azrack found that Defendant posed a danger to the community and a risk of flight and accordingly ordered him detained on an order of Detention Pending Trial dated and filed on February 26, 2013. Dkt. Nos. 3, 17. Defendant remains in custody. On April 3, 2013, Joshua L. Dratel, Esq., counsel for Defendant, submitted a letter to this Court seeking a hearing in connection with a renewed bail application. Dkt. No. 10. The letter consisted of a twenty-one (21) page letter submission and attached exhibits numbered one (1) through twenty-three (23). Assistant United States Attorney Amanda Hector, on behalf of the United States of America, submitted a letter to this Court dated April 8, 2013, setting forth the bases for the Government's opposition to this request, arguing that Defendant should remain in custody pending trial. Dkt. No. 11. By letters dated April 19, 2013, Mr. Dratel replied to the letter of Ms. Hector, presenting additional facts and arguments for the consideration of this Court. Dkt. Nos. 18–19. And, on April 22, 2013, pursuant to a stipulation between counsel, Mr. Dratel provided this Court with transcripts of the recorded telephone calls that underlie one of the Government's charges against

1

Defendant. This Court conducted its Bail Hearing on April 22, 2013, after which both the Government and Defense counsel provided additional submissions. Dkt. Nos. 20–22. This Court has carefully considered all of these submissions, their attachments, the transcript of the February 26, 2013 hearing held before Magistrate Judge Azrack and her Order of Detention, the Bail Reports of the United States Pre-Trial Services Agency, the Complaint filed on February 26, 2013, and the arguments from the April 22nd Bail Hearing. Upon review of the entirety of the record, this Court now rules as follows: The Bail Application made by the Defendant in this case is denied in all respects.

## DISCUSSION

### I. Applicable Law

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, authorizes this Court to detain a criminal defendant upon finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Second Circuit requires that a district court reviewing a magistrate judge's bail determination "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *United States v. Zahrey*, No. 96 CR 910, 1996 WL 650980, at *1 (E.D.N.Y. Nov. 7, 1996) (Gershon, J.) (quoting *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)). "To aid in reaching an independent conclusion, the district court may schedule a *de novo* hearing." *United States v. Gallo*, 653 F. Supp. 320, 328 (E.D.N.Y. 1986) (Weinstein, J.).

In making its bail determination, the Court is required to consider information regarding: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to

any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). In addition, the Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting "requirement that the violent conduct . . . be connected to the activity charged in the indictment"); *United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on uncharged crimes).

The Government must support a finding of dangerousness by clear and convincing evidence, *see United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995), and must support a finding of risk of flight by a preponderance of the evidence, *see United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987). However, in a detention hearing, evidence may be supplied through proffers and hearsay information, and the Federal Rules of Evidence do not apply. *Ferranti*, 66 F.3d at 542; Fed. R. Evid. 1101(d) (3). "A defendant thus may be incarcerated [pending trial] without the many constitutional and evidentiary protections normally guaranteed to those who are to be punished pursuant to judicial proceedings." *Gallo*, 653 F. Supp. at 334. Indeed, because detention pending trial is considered "regulatory rather than punitive," the decision to detain a defendant pending trial "does not require proof of a threat beyond a reasonable doubt, is not subject to Sixth Amendment jury guarantees, and does not provide for the defendant's right to confront and cross-examine witnesses." *Id.*

Nonetheless, mindful of the due process considerations attendant to any form of detention, "[t]he power to incarcerate before trial 'must be exercised with circumspection. It may be invoked only when and to the extent justified by danger which the defendant's conduct presents.'" *Id.* at 332 (quoting *Bitter v. United States*, 389 U.S. 15, 16 (1967)).

## II. The Nature and Circumstances of the Offenses Charged

The Court must first consider the nature and circumstances of the offenses charged, "including whether the offense is a crime of violence." 18 U.S.C. § 3142(g) (1). The Bail Reform Act broadly defines a "crime of violence" as:

> (A) an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another; [or]
>
> (B) any offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 3156(a)(4). The Second Circuit has noted that this definition "extends substantially beyond the conventional meaning of 'crime of violence,'" and that "[c]lause (B) is clearly intended to cast a wider net . . . [to include] offenses that give rise to a possibility, rather than a certainty, that force may be used." *United States v. Dillard*, 214 F.3d 88, 91–92 (2d Cir. 2000) (discussing 18 U.S.C. § 3156(a) (4) (B)). The *Dillard* Court identified five elements to the definition provided in clause (B):

> (i) [t]he offense must be a felony;
> (ii) the offense must involve a "risk that physical force may be used against the person or property of another;"
> (iii) that risk must result from the nature of the offense;
> (iv) the risk must be that the use of force would occur 'in the course of' the offense; and
> (v) the risk must be "substantial."

*Id.* at 92–93. After considering the first four elements in relation to the felon-in-possession charge at issue in that case, the *Dillard* Court noted that whether or not the risk of violence is "substantial" is a less straightforward determination, which required consultation of the legislative histories of both the Bail Reform Act and the relevant felon-in-possession provision. *Id.* at 94–95. The Court concluded in part that "substantial" should be leniently construed to

comport with the Bail Reform Act's purpose of providing a "broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions." *Id.* at 95.

The indictment herein charges Defendant with one count of making a false statement in a Petition for an Alien Relative, in violation of 18 U.S.C. § 1546(a) ("visa fraud"), and one count of communicating a threat in interstate commerce, in violation of 18 U.S.C. § 875(c) ("transmitting threats"). With respect to the second charge, the indictment specifically provides Defendant did knowingly and intentionally transmit in interstate commerce "communications threatening the lives of John Doe and his family, individuals whose identities are known to the Grand Jury." Indicment, Dkt No. 5, at 2. Violation of 18 U.S.C. § 875(c) constitutes a felony; it not only involves a "risk that physical force may be used against the person . . . of another," but is defined according to that risk; and the risk arises "in the course of" the communication of the threat. 18 U.S.C. § 3156(a)(4). Because the statute requires that the communicated threat be a "true threat" for prosecution to succeed, *see United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997), there is little room for argument that the risk of violence is not "substantial." Therefore, communicating a threat in violation of 18 U.S.C. § 875(c) constitutes a "crime of violence," warranting detention under the Bail Reform Act. *See Dillard*, 214 F.3d at 97; *see also United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) (holding that commission of crime by means of extortion and intimidation amounts to a "crime of violence"); *United States v. Gotti*, No. 02 CR 606, 2002 WL 31946775, at *5–6 (E.D.N.Y. June 10, 2002) (Pollak, M.J.) (same).

Defendant does not dispute this characterization. Moreover, as described in detail *infra*, the Government has proffered substantial evidence that Defendant committed the offense of transmitting threats.

### III. The Weight of the Evidence Against Defendant

In its opposition motion, the Government argues that the evidence proffered in support of the two charges against Defendant is "overwhelming." Dkt. No. 11, at 8. In support of the visa fraud charge, the Government points to multiple statements—both pre- and post-arrest—wherein the Defendant admits to filing the relevant visa petition. *Id.* Moreover, the visa petition was mailed from Defendant's address in Brooklyn, New York and bore the signature of Defendant's daughter Amina Ajmal ("Ms. Ajmal"), despite the fact that Ms. Ajmal was living in Pakistan at the time of the signature and mailing. *Id.* In support of the second charge for transmitting threats, the Government points to the transcription of several consensually recorded conversations between Defendant and Ms. Ajmal, which reveal Defendant's unrelenting intention to kill Ms. Ajmal's so-called "cousin," Shujat Abbas, and his entire family. *Id.* at 8–10.

This Court has been provided with draft transcripts of six consensually recorded conversations between Defendant and Ms. Ajmal. In these conversations, Defendant repeatedly and explicitly threatened to kill Shujat Abbas and his family unless Ms. Ajmal returned home. Dkt. No. 11, at 2–7. For example, on February 20, 2013, Defendant stated: "I will not end this, until I find you. I will kill their entire family. . . . I swear to God, no harm will be done to you, if you come back home. No one will bother you. Otherwise, I will catch each and every person of their family, and will kill them, until I find you."[1] *Id.* at 3. Later in that same conversation, Defendant states: "I will continue to shoot at them. I will kill myself and kill them as well." *Id.* In a conversation the next day, the following exchanges between Defendant and Ms. Ajmal were recorded:[2]

---

[1] Although the Government's brief stated that this conversation took place on February 21, 2013, the transcripts provided to the Court indicate that the actual date of the conversation was February 20, 2013.
[2] The transcripts provided under seal to the Court have slight variations in language from the transcriptions provided in the Government's brief. These minor differences do not change the substance

6

> Defendant: "You come before something happens."
>
> Ms. Ajmal: "What will you do?"
>
> Defendant: "I will kill them, I will kill one of their[s]."
>
> . . .
>
> Defendant: "I will kill them one by one and go to jail . . . the whole family will go to jail . . . ."
>
> . . .
>
> Defendant: "If you come back then I will spare them. Come home and they are spared. If you don't come then it's death and death."

*Id.* at 3–4.

Just days after Defendant made these statements, on February 25, 2013, two of Shujat Abbas' immediate family members, Mohammad Asghar[3] ("Mr. Asghar") and his daughter Mahida, were shot and killed in Pakistan, and another relative was severely injured. *Id.* at 4. An eyewitness to the murders, Rukhsana Kausar ("Ms. Kausar"), reported that Defendant's brother, Muhammad Akmal Choudhry (a/k/a "Mohammad Akmal"), was observed standing over the murdered victims, holding a gun, and desecrating the bodies. Dkt. No. 10, Ex. 9. Ms. Kausar separately reported that the murders were committed at the behest of Defendant. *Id.* Ms. Kausar filed a police report, which was written up in Pakistan through the U.S. Consulate, Dkt. No. 17 (Tr. of Feb. 26, 2013 Bail Hr'g) at 9:14–19, and the Government of Pakistan has issued an arrest warrant for Defendant in connection with these murders, Dkt. No. 23. On the day of the murders, Defendant was consensually recorded denying his involvement in the murders, but also

---

of the conversation or of the threats made by Defendant. In fashioning this opinion, the Court has chosen to rely on the public record.

[3] Defense counsel refers to Mr. Asghar as Mr. Ashgar. This Court has chosen to follow the spelling in the Pakistani police report. *See* Dkt. No. 10, Ex. 9.

making the following statements: "I will kill the entire family. I have already thought about who to kill. I know I will not leave them alive," and "I said I will not leave a single one of them alive, and now, I swear in front of you, that I will not spare a single one." Dkt. No. 11, at 5–6.

Defendant does not contest that he made these threats. Instead, Defendant attempts to undermine the credibility of the Pakistani police report—the only direct evidence implicating Defendant in the February 25 murders—through submission of evidence tending to exonerate the named assailants and challenging Ms. Kausar's statement, which provided the predicate for the police report.

Defendant notes four of the eleven persons reported to be present and involved in the murders have established independently confirmed alibis, supported by four separate affidavits. Dkt. No. 10, at 8–9. For example, according to the sworn affidavit of Malik Matee Ullah, Advocate of the High Court in Lahore, Ehsan Ullah, a named assailant, was purportedly working at the affiant's law chambers at the time of the murders. *Id.* Another named assailant, Javed Iqbal, was purportedly working at the construction site for a primary school at the time of the murders, according to the sworn affidavit of co-worker Shabir Ahmed. *Id.* at 9. Similarly, Fazal Hussain, a "cultivation" worker at a "tube well" near Chor Chak, swore that a third named assailant, Shahid Iqbal, was working alongside him at the time of the murders. *Id.* The sworn affidavit of brick business owner Tariq Mehmood supports the alibi of a fourth named assailant, Mazhar Iqbal. *Id.*

Defendant separately attacks the credulity of Ms. Kausar's account overall. In particular, Defendant notes that Ms. Kausar reported "[t]he accused persons have committed this offence on the advice and instigation of Afzal and Mr. Choudhry," without providing any source or support for this information. *Id.* at 9–10 (internal editing omitted). Defendant further challenges Ms.

8

Kausar's report because she "fails to explain how she was able to witness the incident" and escape on foot with one of her daughters while her husband, grandson, and other daughter were unable to escape by motorcycle. *Id.* at 10, n.6.

Defendant also references the account of Zabir Abbas, asserted to be another surviving victim of the February 25, 2013 incident, whose account substantially conflicts with that provided by Ms. Kausar. *Id.* at 11. Zabir Abbas reported he was driving a motorcycle with Ms. Mr. Asghar and Mahida when they were accosted by two unknown men. *Id.* The men blocked the motorcycle and then fired at Mr. Asghar and Mehida. *Id.* However, although Defendant claims Zabir Abbas' report was separately reported to Pakistani law enforcement, Defendant has not provided this account to the Court. Rather, Defendant has provided two affidavits from Zabir Abbas.[4] These affidavits state that the four men who have independently established alibis, as described *supra*, did not participate in incident, nor did a fifth accused individual, Defendant's brother Mr. Muhammad Akmal. Dkt. No, 19, Exs. 1–2. The two affidavits do not affirmatively support the substantive account of the incident that Defendant's counsel claims Zabir Abbas has provided, nor is there any evidence in the record substantiating this account.

As noted in the police report, Ms. Kausar reported the assailants were acting in retaliation against Mr. Asghar, for registering a criminal case against the accused persons. Dkt. No. 10, Ex. 9. Defendant asserts the referenced charge is neither credible nor accurately described, for multiple reasons. First, Defendant asserts the charge was in fact manufactured by Mr. Asghar's son, Shujat Abbas, the cousin who helped Ms. Ajmal flee Pakistan, although the Court notes the absence of authority in support of this assertion. *Id.* at 10. Second, Defendant points to the

---

[4] In Ms. Kausar's report, the referenced affiant is identified as "Zabir Abbas." However, Defendant notes that Mr. Abbas executed his affidavits as "Zamir (Zameer) Abbas." Defendant represents that these names refer to a single individual and a member of Shujat Abbas's family, and the Government does not contest this representation.

9

sworn affidavit of Muhammad Hussain, neighbor to Mr. Asghar, who overheard the incident referenced by the charge and was "informed by others that [Mohammad Asghar's son] Shujat Abbas"—not the accused persons—"[had] fired at his sister." *Id.* Third, Defendant notes that Mr. Asghar initiated an action for an injunction against a neighbor with respect to a dispute over ownership over real property. *Id.* at 10–11. In light of these assertions, Defendant argues, Ms. Kausar's statement about the assailants' motive is not credible and, therefore, the overall police report is also not credible.

Finally, Defendant argues that he did not attempt to travel to Pakistan either before or after the homicides occurred, *id.* at 11, although Defendant does not argue why, or how, his lack of travel plans belies his involvement in the crime.

The Court concludes the evidence against Defendant Choudhry weighs strongly in favor of pretrial detention. The Government has introduced multiple transcribed conversations in which Choudhry is recorded communicating threats to kill multiple people in Pakistan. This alone is sufficient to satisfy the elements of 18 U.S.C. § 875(c): Defendant (1) transmitted in interstate commerce; (2) a communication containing a threat; (3) to injure the person of another. Defendant has not contested this evidence, the Government's primary evidence in support of Defendant's charge for a crime of violence. This uncontroverted evidence of explicit and chilling threats to kill numerous people in Pakistan is sufficient, on its own, to warrant pre-trial detention for being charged with a violent crime.

Although not necessary to its decision, the Court notes that the Government has introduced undisputed evidence that several members of Shujat Abbas' family—the persons to whom Defendant directed his threats—were killed days after Defendant communicated those threats. Based on timing alone, it stands to reason that this event was not a random coincidence.

Moreover, the Government has introduced an official document, a police report from Pakistani law enforcement, obtained from the U.S. Consulate, which directly implicates Defendant in the execution of the murders. While the Defendant has introduced numerous assertions, and some evidence, attempting to undermine the police report, the Court does not credit Defendant's attempts. In particular, Defendant's only assertion directly controverting the police report, Zabir Abbas' purported statement to the police providing a substantially different account of the murders, is not supported by any evidence in the record. This omission is especially notable because Zabir Abbas submitted two separate affidavits related to his observations of this crime, but nonetheless failed to substantiate his alleged account. In addition, while Defendant attempts to undermine Ms. Kausar's report by challenging the source of her knowledge about the incident, the Court has no reason to doubt Ms. Kausar's knowledge other than Defendant's conclusory assertions. Unfortunately, it is currently not within this Court's power to have Ms. Kausar questioned about the basis for her knowledge of Defendant's involvement in the murders. However, evidence submitted by both sides demonstrates that Defendant and Ms. Kausar, and their respective relations, are acquainted. This familiarity renders unlikely any case of mistaken identity and buttresses the possibility that Ms. Kausar's report was accurate. Furthermore, the Court finds that Ms. Kausar's escape on foot is not so implausible as to undermine her character for truthfulness.

Defendants' other arguments do not directly controvert the police report. Although tangentially related to Ms. Kausar's credibility, inasmuch as they challenge the assailants' reported motive, the numerous pieces of evidence submitted in relation to the earlier criminal charge purportedly filed by Mr. Asghar against the assailants do not directly undermine the information she provided in the police report. Even if the Court were to credit this evidence as

11

undermining the assailants' reported motive, the evidence does not contradict Ms. Kausar's direct observation of the murders. Nor does this evidence preclude the possibility of multiple motives for the murders. In addition, even if the five named assailants were falsely identified, the Court notes the absence of any affidavits purporting to provide an alibi for the remaining six assailants.

Finally, this Court notes that the Government of Pakistan has issued an arrest warrant for Defendant for his involvement in a crime reported on February 25, 2013, Dkt. No. 23, the same date of the murders in this case. While that arrest warrant is not evidence of Defendant's guilt, it does suggest that the Government of Pakistan, which has access to the witnesses and alleged assailants in this case and is thus in a better position at this time to evaluate the evidence of the murders, believes that there is enough evidence to charge Defendant.

### IV. Defendant's History and Characteristics

In reviewing a defendant's history and characteristics, a district court should consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3). Good character, strong and lengthy ties to the community, and a lack of drug abuse, among other characteristics, may suggest a defendant is a reduced flight risk; by contrast, an absence of such ties, frequent travel, or strong connections to foreign countries may suggest an increased risk of flight. *See, e.g., United States v. Sabhnani*, 493 F.3d 63, 76–77 (2d Cir. 2007) (because naturalized United States citizen defendants had "maintained strong family ties to their native countries as well as personal and professional ties" to other countries, "flight would impose no insurmountable personal or professional hardship on

defendants"); *United States v. Routollo*, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. July 8, 1988) (Platt, J.) (defendant's frequent travels to the Far East and other parts of the world increased likelihood of flight).

Defendant was born in Pakistan in 1953. He emigrated to the United States in 1990 and received permanent resident status in 2008. For the past seventeen years, Defendant has worked steadily as a taxi driver. Defendant has indicated that he has no financial assets in the United States and that he filed for bankruptcy a few years ago.

Prior to his arrest and detention, Defendant lived in his son's home in Brooklyn with several of Defendant's children,[5] one son-in-law, ten grandchildren, and one of Defendant's brothers. Defendant's first wife passed away in 1995, and although he subsequently remarried, he is now divorced. Defendant has no prior criminal record and has provided a surplus of letters from family, friends, and members of the community attesting to his good character, family ties, gainful employment, and active involvement in the Brooklyn community. *See, e.g.*, Dkt. No. 10, Ex. 3 (Letter from Mushtaq Ali); *id.*, Ex. 21 (Aff. of Mohammad Raja Iqbal).

Although Defendant has considerable ties to the United States, he also has strong familial, personal, professional, and financial ties to Pakistan. Defendant remains a citizen of Pakistan, continues to hold a Pakistani passport, and visited Pakistan as recently as November 2012. Many of Defendant's family members, including a brother, a sister, two daughters, and numerous cousins, currently live in Pakistan. *Id.*, Ex. 7 (St. of daughter Tasneem Ajmal); *id.*, Ex. 8 (St. of daughter Yasmin Ajmal). Defendant's brother, Afzal Choudhry, is a former elected

---

[5] This Court is troubled by Defendant's lack of candor regarding the number of children who live with him in the United States. Defendant told the United States Pre-Trial Services Agency for the Eastern District of New York that he lives with his five children in New York. However, at the bail hearing before Magistrate Azrack on February 26, 2013, Defendant stated that only three of his children live in the United States. This latter figure appears to be confirmed by affidavits submitted to this Court by two of his daughters, who currently live in Pakistan. *See* Dkt. No. 10, Ex. 7 (St. of daughter Tasneem Ajmal); *id.*, Ex. 8 (St. of daughter Yasmin Ajmal).

13

council chief, and Defendant has ties to other leaders and politicians, such as the numberdar (chief) of the village of Chiryawala and a member of the Punjab Provincial Assembly. Dkt. No. 10, at 20; *id.*, Exs. 4–5. Defendant also has a financial interest in his family's home, land, and livestock in Pakistan. *Id.* at 21. According to Defendant, these assets are currently unattended and therefore susceptible to burglary, vandalism, and natural hazards, and it is therefore necessary for someone in the family to return to Pakistan to secure the family's assets. *Id.*

Defendant suffers from a number of medical conditions, including diabetes, high cholesterol, gout, arthritis, obesity, insomnia, and depression. *Id.* at 17. Defendant takes at least seven different medications for these conditions on a daily basis. *Id.* Defendant claims to have been under the care of a team of specialists until his arrest, *id.*, but does not provide any details of his required treatment besides regular medication. These conditions have also not prevented Defendant from undertaking overseas travel, as evidenced by his trip to Pakistan in late 2012.

### V. Defendant's Risk of Flight

This Court finds by a preponderance of the evidence that Defendant poses a significant risk of flight. *See* 18 U.S.C. § 3142(g). As described *supra*, Defendant has been charged with serious felonies, including a crime of violence, and the evidence against him is substantial. With regard to the visa fraud charge, Defendant made multiple statements admitting that he had filed the relevant visa petition, and the evidence shows that it was mailed from Defendant's address at a time when his daughter was still living in Pakistan. Defendant's daughter is also likely to testify at trial that she did not complete or submit the visa application. With regard to the transmitting threats charge, transcripts of consensually recorded phone calls between Defendant and his daughter contain chilling and explicit threats to kill Ms. Ajmal's cousin and the cousin's family, two members of whom were killed just four days later.

The current charges against Defendant for visa fraud and transmitting threats carry maximum sentences of fifteen and five years' imprisonment, respectively. *See* 18 U.S.C. §§ 875(c), 1546(a). Although Defendant argues that the Sentencing Guidelines would likely provide for considerably shorter imprisonment ranges, and that Defendant therefore has no incentive to flee, Dkt. No. 10, at 6–7, this Court is not bound by the Guidelines. *See United States v. Booker*, 543 U.S. 220 (2005). Moreover, Defendant is aware that the Government is conducting an ongoing investigation into allegations that he held his daughter captive in Pakistan, forced her into an arranged marriage, and ordered several murders in Pakistan. The very real prospect that the Government of the United States may bring further serious charges against Defendant provides Defendant with yet another incentive to contemplate flight.

Finally, although this Court recognizes and has considered Defendant's longstanding ties to the Brooklyn community, the Court finds that these local ties are counterbalanced by Defendant's equally strong ties to Pakistan. Defendant is still a citizen of Pakistan, has close family who live there, is well-connected to Pakistani politicians, and traveled to the country just six months ago. *See United States v. Solano-Fell*, No. 07-CR-6197, 2009 WL 66071, at *2 (W.D.N.Y. Jan. 8, 2009) (Larimer, J.) (defendant's foreign citizenship, family ties to other countries, and visits to those jurisdictions suggested "a significant risk of flight"); *United States v. Pryce*, No. 04-CR-316S, 2005 WL 464945, at *4 (W.D.N.Y. Feb. 21, 2005) (Skretny, J.) (foreign citizen with extensive ties to home country, including a child who still lived there, was a flight risk). Moreover, all of Defendant's financial assets, including an interest in the family home, land, and livestock, are in Pakistan. *See Sabhnani*, 493 F.3d at 77 (defendants' overseas assets contributed to flight risk). For these reasons, "flight would impose no insurmountable personal or professional hardship on defendant[]." *Id.* at 76.

## VI. The Nature and Seriousness of the Danger Defendant Poses to the Community

As discussed *supra*, Choudhry is charged with transmitting threats, a "crime of violence," as that term is defined by the Bail Reform Act. *See* 18 U.S.C. § 3156(a)(4)(B). The Government's evidence in support of that charge is both strong and unchallenged by Defendant. Moreover, that evidence provides ample bases on which this Court may conclude that there is clear and convincing evidence that Defendant continues to pose a danger to the community and a risk of obstruction of justice. Defendant repeatedly states that he will not stop killing Shujat Abbas's family until he finds his daughter Amina Ajmal, who is currently the Government's primary witness against Defendant. For example, Defendant is recorded making the following statements, both before and after the February 25, 2013 murders:

- "I will not end this, until I find you. I will kill their entire family."

- "I will catch each and every person of their family, and will kill them, until I find you."

- "I will continue to shoot at them. I will kill myself and kill them as well."

- "I will kill them one by one and go to jail . . . the whole family will go to jail."

- "[C]ome back home, otherwise, all of us will be killed and so will they."

- "I will kill the entire family. I have already thought about who to kill. I know I will not leave them alive."

- "I said I will not leave a single one of them alive, and now, I swear in front of you, that I will not spare a single one."

- "I will not leave a single member of their family alive."

Dkt. No. 11, at 3–6. Not only is Defendant recorded communicating threats in interstate commerce, he is recorded avowing his relentless determination to see them through. As the Government argues, "[i]f [Defendant] were to be released on bail, he would likely persist in

efforts to locate [Ms. Ajmal]." *Id.* at 10. Indeed, Defendant himself stated that the prospect that he might go to jail would not deter him from following through on his threats in order to force Ms. Ajmal to return home. *Id.* On this evidence alone, the Court concludes that there is clear and convincing evidence Defendant poses a serious danger to the community and a risk of obstructing the Government's prosecution of this case.

However, the Government also submits evidence with regard to dangerousness that rests on allegations outside of the indictment. Contrary to Defendant's argument, the Court may consider this evidence as part of its bail determination. *See Rodriguez*, 950 F.2d at 88. The Court has already examined, at length, the Government's evidence implicating Defendant in the February 25, 2013 murders in Pakistan. Although 18 U.S.C. § 3142 does not define the term community, courts considering the scope of this term have concluded that it may encompass communities outside the United States at risk of danger from a particular defendant. *See, e.g., United States v. Hir*, 517 F.3d 1081, 1087–89 (9th Cir. 2008) (stating in dicta that "requiring a court in the Eastern District of New York, which includes one part of New York City, to ignore the threat posed by an alleged narcotics dealer to the community in the state's Southern District, which covers another part of that city, would not only be illogical but [also] irresponsible"); *see also United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1357 (M.D. Fla. 2003) (Pizzo, M.J.) (considering defendants' participation in the Palistinian Islamic Jihad, which advocates the destruction of Israel and uses violence to achieve that goal, in finding that defendants were a danger to the community). As discussed, the Court has concluded that the evidence, in light of the timing of the murders relative to the recorded conversations, weighs in favor of Defendant's involvement in the murders on February 25, 2013. As further example, Ms. Ajmal reported that Defendant directed relatives in Pakistan to hold her against her will and forced her by threat of

death into an arranged marriage with a Pakistani national seeking United States citizenship. Dkt. No. 1, at ¶ 2. It is possible, based on the facts before this Court, that Ms. Ajmal's escape, with the assistance of Shujat Abbas, is what caused the "dishonor" Defendant perceives, Dkt. No. 11, at 2, 10, which has in turn induced Defendant to threaten to kill—and possibly kill—Shujat Abbas and his family. Exploration of whether this Defendant is capable of executing this threat—or indeed has already in fact begun to execute it—is one expedition this Court will not condone.

### VII. Alternatives to Detention

Although this Court has found that Defendant is a flight risk and presents a danger to the community, the Government must also demonstrate that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Such alternative conditions may include, *inter alia*, a bond, electronic monitoring, or home detention.

Defendant has indicated that his family is prepared to post the family home in Brooklyn as part of a bail package. Dkt. No. 10, at 19. Defendant has also stated that he is amenable to any conditions imposed by the Court, including electronic monitoring. *Id.* at 20.

This Court finds, however, that no set of release conditions could adequately assure Defendant's presence in Court and protect the community. It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding. *See, e.g., United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor

18

compliance extensively, protection of the community would be left largely to the word of [defendants] that [they] will obey the conditions.") (citations and internal quotation marks omitted); *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985) (reversing decision to release leader of an enterprise that carried out its criminal activities at his direction). In this case, Defendant allegedly orchestrated the murders of individuals thousands of miles away in Pakistan, a crime that necessarily required elaborate communication and the ability to command other individuals. Moreover, this crime was allegedly committed by members of Defendant's family. Consequently, even if this Court were to impose home detention and electronic monitoring, and limit Defendant's visitors to immediate family, there is no way that this Court could guarantee that Defendant would not direct family members to continue to carry out his threats to kill all of the members of Ms. Ajmal's cousin's family. Under these circumstances, the Court concludes that home detention, electronic surveillance, and related conditions would not adequately shield the community from the threat posed by Defendant. I therefore order that Defendant remain in detention pending trial.

**SO ORDERED**

Dated: Brooklyn, New York
April 26, 2013

s/WFK

_____
HON. WILLIAM F. KUNTZ, II
United States District Judge