EMN:AH/MEG/RMT
F.#2013R00312

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          13 CR 150 (S-1) (WFK)

MOHAMMAD AJMAL CHOUDHRY,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

POST-HEARING MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS POST-ARREST STATEMENTS

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Amanda Hector
Richard M. Tucker
Margaret Gandy
Assistant U.S. Attorneys
(Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in further opposition to the defendant's May 5, 2014 motion to suppress his post-arrest statements.   As was made clear through Diplomatic Security Service Special Agent Matthew Maguire's testimony during the hearing before the Court on May 23, 2014, the defendant (1) was not questioned about the case, nor did he make substantive statements about the case, prior to being given Miranda warnings, and (2) after he was advised of his Miranda rights and invoked his right to counsel, he spontaneously made a series of incriminating statements unprompted by any interrogation.   Accordingly, the defendant's post-arrest statements are admissible at trial, and his suppression motion should be denied.

<u>AGENT MAGUIRE'S TESTIMONY</u>

During the May 23, 2014 suppression hearing, Agent Maguire testified to the

following facts.

The defendant was arrested at approximately 8:45 pm at his Brooklyn residence.

(Tr. 7, 12).   While placing the defendant under arrest, Agent Maguire advised the defendant

that he was being arrested for visa fraud and making interstate threats.   (Tr. 7).   As agents

took the defendant into custody, Agent Maguire confirmed that the defendant could speak and

understand English and asked the defendant questions about his medical history.   (Tr. 8).

Agents then obtained the defendant's medications, passport, driver's license and cellular

phone before departing his residence.   (Tr. 8-9).   The defendant was transported to the

Department of Homeland Security's field office ("HSI headquarters") in New York, New

York for processing in Agent Maguire's government-issued sports utility vehicle.   (Tr. 9).

While the defendant was being transported, Agent Maguire and HSI Special Agent Susan Ruiz

asked the defendant standard pedigree questions necessary for processing, such as

biographical information, familial relationships, as well as whether the defendant had any

distinguishing marks, prior arrests or criminal record.   (Tr. 10-11).   The agents did not advise

the defendant of his <u>Miranda</u> rights while they were transporting him back to HSI headquarters

because they had no intention of questioning him substantively during that car ride.   (Tr. 11).

Accordingly, none of the agents asked the defendant any substantive questions about the case

or his charges while he was being transported back to HSI headquarters, and the defendant

made no substantive statements during that car ride.   (Tr. 11).

2

After the defendant arrived at HSI headquarters and was given the opportunity to drink water and use the restroom, the agents brought the defendant into an interview room at approximately 9:35 p.m.   (Tr. 12, 34).   Agents Maguire and Ruiz were present in the room, as well as Investigative Analyst Alex Cooper.   (Tr. 13).   The defendant was not handcuffed at this point in time.   (Tr. 13).   Agent Maguire again advised the defendant of the reason for his arrest and asked him whether he understood English.   (Tr. 12-13).   In response, the defendant indicated that he was able to both speak and understand English.   (Tr. 13).   Agent Maguire also asked the defendant whether he was able to read and write in English, and he replied affirmatively.   (Tr. 13).   Notwithstanding the defendant's command of English, Agent Maguire informed the defendant that an interpreter could be contacted if, at any time, the defendant did not understand the agents.   (Tr. 13).    The defendant responded that he could read, write and speak English and had no questions.   (Tr. 14).

Agent Maguire then orally gave Miranda warnings to the defendant, who stated that he understood them.   (Tr. 14).   After giving the defendant oral Miranda warnings, Agent Maguire presented the defendant with a printed "Statement of Rights" form ("GX 1") setting forth the same warnings.   (Tr. 14-15).    Agent Maguire read the form verbatim and asked the defendant if he understood the form.   (Tr. 16).   The defendant responded that he did understand.   (Tr. 16).   Agent Maguire then asked the defendant to read each line on GX 1 aloud and then to summarize orally each line of the form in the defendant's own words.[1]   (Tr.

---

[1]    On cross-examination, defense counsel asked numerous questions about the precise words the defendant had used to summarize GX 1.   Agent Maguire did not recall the exact words the defendants used for those summaries, but testified that he found the defendant's summaries satisfactory.   (Tr. 40-41).   Notably, Agent Maguire did testify that he

16).   After the defendant did that, Agent Maguire asked the defendant to write his initials next to each line, and the defendant wrote "CH" next to each line.   (Tr. 16).   Agent Maguire then asked the defendant whether he was willing to participate in an interview.   (Tr. 17).   The defendant responded that he would be willing to speak about the visa, but not about Pakistan. (Tr. 17).   Agent Maguire then advised the defendant that the agents would be willing to speak with the defendant about whatever topics he chose, but that the defendant would have to waive his rights before that could occur.   (Tr. 17).   Agent Maguire then re-read the "waiver of rights" section of GX 1, and had the defendant read and summarize that language on GX 1. (Tr. 17).   The defendant then told the agents that he wanted to speak to a lawyer.   (Tr. 18). This invocation occurred at approximately 9:45 p.m.   (Tr. 43-44).

After the defendant invoked his right to counsel, Agent Maguire informed the defendant that he would be processed and transported to jail overnight, and then brought to court the following morning.   (Tr. 19).   Agent Maguire also told the defendant that he would have an opportunity to speak to a lawyer in the morning prior to any court proceedings.   (Tr. 19).   As agents prepared to escort the defendant to the processing area, the defendant spontaneously began speaking, making various substantive, incriminating statements to the agents.   (Tr. 19-20).

When the defendant paused, Agent Maguire explained that the defendant had asked for a lawyer, and that agents would not ask any questions at that point or until such time as the defendant had met with his lawyer.   (Tr. 20).   Nevertheless, the defendant resumed

---

recalled that the defendant had summarized the line from GX 1, "You have the right to remain silent," as "I don't have to say anything or I don't have to talk."   (Tr. 41).

speaking.   (Tr. 20).   At some point, Agent Ruiz interrupted the defendant, reminded the defendant that he had asked for a lawyer and that the agents had not and would not ask him any questions.   (Tr. 20).   Agent Ruiz then pointed to GX 1.   (Tr. 20).   The defendant then thought for a moment and reaffirmed that he wished to speak to a lawyer prior to speaking with the agents.   (Tr. 20).   At that point, approximately 9:59 p.m., agents escorted the defendant to the processing area.   (Tr. 20, 55-56).

Altogether, the defendant talked for approximately ten minutes after he initially indicated that he wanted to speak to a lawyer.   (Tr. 21).   The defendant's demeanor was "very cool, calm, collected, reasonable."   (Tr. 21).   At no point during this period when the defendant was making substantive, incriminating statements did Agent Maguire, Agent Ruiz or Investigative Analyst Cooper ask the defendant any questions.   (Tr. 20-21).

<u>ARGUMENT</u>

Agent Maguire's testimony establishes that the defendant's Fifth Amendment rights were not violated.   The agents asked the defendant only pedigree and booking questions prior to advising the defendant of his <u>Miranda</u> rights.   Then, after Agent Maguire properly instructed the defendant regarding his <u>Miranda</u> rights, the defendant invoked his right to counsel.   Following that invocation of rights, even after the defendant spontaneously began to make substantive, incriminating statements, the agents asked the defendant no questions and repeatedly reminded him that he had requested a lawyer.   The defendant's statements are admissible at trial, and his suppression motion should be denied.

I.      Prior to Advising the Defendant of His *Miranda* Rights, the Agents
        <u>Asked Him No Substantive, Case-Related Questions</u>

Agent Maguire's testimony is clear and uncontroverted that neither he nor the other agents asked the defendant any substantive, case-related questions while they were at the defendant's residence or while they were transporting the defendant back to HSI headquarters. (Tr. 11).   The only questions that the agents asked were standard booking and pedigree questions designed to confirm the defendant's identity, identify potential medical issues and obtain emergency contact information so that the defendant could be safely incarcerated.   (Tr. 10-11).   Indeed, as Agent Maguire explained in response to the Court's question, agents did not <u>Mirandize</u> the defendant while he was being transported away from his house because the agents did not plan to interview him about the case until he was safely back at HSI headquarters.   (Tr. 11).   The defendant's affidavit in support of his suppression motion does not state otherwise.   (Def. Aff. ¶ 2 ("As we sat in the vehicle near my home, agents in the

6

vehicle proceeded to ask me a number of questions about me and my family. . . . These questions continued as I was transported back to the agents' office in Manhattan.")).

The Second Circuit has consistently held that "pedigree questions," or "[r]outine questions about a suspect's identity . . . ordinarily innocent of any investigative purpose, do not pose the dangers <u>Miranda</u> was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'"   <u>United States v. Gotchis</u>, 803 F.2d 74, 79 (2d Cir.1986) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)); <u>see also</u> <u>United States v. Brown</u>, 2008 WL 4585325, at *3 (2d Cir. Oct. 14, 2008) (holding that there is no violation of a defendant's <u>Miranda</u> rights in the routine pedigree questions posed as part of standard police booking procedures); <u>United States v. Rodriguez</u>, 356 F.3d 254, 259 n.2 (2d Cir. 2004) ("pedigree information solicited through routine questioning of arrested persons . . . does not implicate the protections of <u>Miranda</u>" ); <u>United States v. Carmona</u>, 873 F.2d 569, 573 (2d Cir. 1989) ("obtaining such pedigree information has not been viewed as unlawful custodial interrogation"); <u>United States v. Adegbite</u>, 846 F.2d 834, 838 (2d Cir. 1988) ("the solicitation of information concerning a person's identity and background does not amount to custodial interrogation"); <u>United States v. Hill</u>, No. 12 CR 214 (KAM), 2013 WL 3243657, at *7 (E.D.N.Y. June 26, 2013) (holding that questioning regarding defendant's arrest history did not violate <u>Miranda</u>).   Pedigree questions can include questions about a suspect's name, address, employment history, date of birth, <u>see</u> <u>Gotchis</u>, 803 F.2d at 78–79, nicknames, <u>see</u> <u>Adegbite</u>, 846 F.2d at 838, other basic identification-related information such as marital status, <u>see</u> <u>United States ex rel. Hines v. La Vallee</u>, 521 F.2d 1109, 1113 (2d Cir. 1975), and health

information, see United States v. Rodriguez, No. 07 CR 699 (HB), 2008 WL 52917, at *3 n.4 (S.D.N.Y. Jan. 2, 2008).

Because the defendant was asked only questions to properly obtain booking and pedigree information prior to being advised of his Miranda rights, his responses to those questions are admissible at trial.

II.    The Defendant's Spontaneous Post-*Miranda* Statements Were Not the
       Product of Interrogation and Are Admissible

Agent Maguire's testimony established that the agents properly advised the defendant of his Miranda rights, and that they were particularly careful to make certain that the defendant fully understood his rights.   Even after confirming that the defendant spoke English at the time he was taken into custody, once back at HSI headquarters Agent Maguire again offered the defendant the services of an interpreter, and the defendant again responded that he could read, write and speak English and did not want an interpreter.   (Tr. 12-13).   Agent Maguire further verified that the defendant spoke English and fully understood his Miranda rights by reading GX 1 to the defendant, asking the defendant to read GX 1 aloud, and then asking the defendant to summarize the rights set forth in GX 1 line-by-line.   (Tr. 14-16).   The defendant then wrote his initials, "CH," on each line after he summarized that line of GX 1. (Tr. 16).

When Agent Maguire asked the defendant whether he would waive his rights, the defendant responded that he was willing to talk about the visa, but not about Pakistan.   (Tr. 17).   This statement establishes that the defendant was able to understand Agent Maguire, because the statement was responsive to Agent Maguire's question about whether the

defendant was willing to waive his rights.   Even more significantly, the defendant's statement establishes that he fully understood his rights, because, by indicating that he was willing to discuss only certain subjects, the defendant demonstrated that he appreciated that he had the right to remain silent regarding other subjects.

Notwithstanding the defendant's oral waiver of rights, Agent Maguire advised the defendant that the agents would not ask him any questions unless the defendant signed GX 1.  (Tr. 17-18).   When the defendant then asked for a lawyer, Agent Maguire did not ask the defendant any further questions and prepared to finish processing the defendant's arrest.   (Tr. 19).   Then, when the agents prepared to leave the interview room, the defendant began to make a spontaneous, inculpatory statement.   The defendant spoke for approximately ten minutes (in English) after requesting a lawyer, despite agents' repeated reminders that he had invoked his right to counsel and that they would not, therefore, ask him any questions.   (Tr. 20-21).   Throughout this period of time, the agents asked the defendant no questions.   (Tr. 20-21).

As set forth in greater detail in the government's May 16, 2014 memorandum of law, it is well-established law that where a defendant invokes his right to counsel but then spontaneously reinitiates communication with law enforcement officials, those spontaneous statements are admissible at trial.   See, e.g., United States v. Montana, 958 F.2d 516, 519 (2d Cir. 1992) (where defendant initially asserted his Miranda rights but subsequently stated that "he could not believe he was in all this trouble for $50," the defendant's "spontaneous and unsolicited declaration was admissible"); United States v. Colon, 835 F.2d 27, 30-31 (2d. Cir. 1987) (finding spontaneous statements and response to subsequent question from law

enforcement officer admissible because statements "were not the product of an interrogation or its functional equivalent" despite fact that defendant had previously invoked his right to an attorney); United States v. Annuci, No. 06 CR 982 (BSJ), 2007 WL 1310156, at *6 (S.D.N.Y. May 3, 2007) (holding that where defendant initially declined to speak with law enforcement officers and requested an attorney but later made a series of spontaneous, inculpatory statements while he was being transported for processing, statements were admissible because they were "the result of a conversation initiated by the Defendant, were volunteered and not the product of custodial interrogation").

Because the defendant's post-Miranda communications were spontaneous and did not occur as a result of any questioning by law enforcement officers, they are admissible at trial.[2]  Likewise, despite the defendant's claim otherwise in his motion papers, there is absolutely no evidence that the agents engaged in the "functional equivalent" of interrogation after the defendant invoked his Miranda rights.   Indeed, to the contrary, the agents repeatedly reminded the defendant that he had invoked his Miranda rights.   Accordingly, this claim by the defendant likewise fails.

---

[2]        In his affidavit filed in support of his suppression motion, the defendant contends that agents "continued to ask me questions" after he invoked his right to counsel. This claim is flatly disproved by Agent Maguire's credible testimony, and the government submits that Court should accord the defendant's affidavit no weight.   See, e.g., United States v. Thompson, No. 10 CR 94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) (noting that assertions in defendant's affidavit are "not entitled to any weight" where they could "neither be tested by cross-examination nor corroborated by the Court's observation of [the defendant's] demeanor"); United States v. Polanco, 37 F. Supp. 2d 262, 264 (S.D.N.Y. 1999) (defendant's affidavit is "rarely, if ever, considered by a judge in assessing the evidence at the suppression hearing").

<u>CONCLUSION</u>

For the additional reasons set forth above, the defendant's post-arrest statements are admissible at trial, and the Court should deny the defendant's suppression motion in its entirety.

Dated:       Brooklyn, New York
              May 30, 2014

                                    Respectfully submitted,

                                    LORETTA E. LYNCH,
                                    United States Attorney,
                                    Eastern District of New York

By:      /s/
                                    Amanda Hector
                                    Richard M. Tucker
                                    Margaret E. Gandy
                                    Assistant U.S. Attorneys
                                    (718) 254-6212/6204/6213