UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                               :
:       DECISION AND ORDER
:       13-cr-150
-against-                                               :
:
:
MOHAMMAD AJMAL CHOUDHRY,                                :
:
Defendant.                                 :
:
------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Defendant Mohammad Ajmal Choudhry is charged in a three-count superseding indictment with conspiracy to commit murder in a foreign country, transmission of threats to injure, and fraud and misuse of petition for alien relative. Trial in this case will commence on June 16, 2014. Before the Court is Defendant's motion to suppress statements he made following his arrest on February 25, 2013. This Court held an evidentiary hearing on May 23, 2014 and heard the testimony of Special Agent Matthew Maguire of the United States State Department Diplomatic Security Services. The testimony of Agent Maguire established that prior to issuing the Defendant his *Miranda* warnings, the Defendant was only asked pedigree and background questions necessary for processing and booking. The Defendant provided responsive, non-substantive answers to these questions. Furthermore, the testimony established that after invoking his right to counsel, the Defendant spontaneously provided incriminating statements to agents at the Department of Homeland Security offices. The Court finds that the agents neither interrogated the Defendant nor engaged in any actions that were the functional equivalent of interrogation. Accordingly, the Court denies the Defendant's motion to suppress in its entirety.

## FINDINGS OF FACT

The only evidence received at the evidentiary hearing on this motion was the testimony of Diplomatic Security Services Special Agent Matthew Maguire. The Court finds that the testimony of Agent Maguire was credible, convincing, consistent, and uncontroverted. His testimony was wholly consistent with Department of Homeland Security notes documenting the events of February 25, 2013, submitted as an exhibit by the Defendant. (*See* Def.'s Mot. to

Suppress, Dkt. 57, Ex. B). Agent Maguire's testimony withstood the thorough cross examination of defense counsel—no germane inconsistencies or flaws were revealed. Furthermore, no competing narrative contradicted Agent Maguire's account, save for the bare, conclusory statements in the Defendant's affidavit.[1] For these reasons, the following facts are adopted as the findings of this Court.

The Defendant was arrested at his Brooklyn, New York home on February 25, 2013 at approximately 8:45 pm. (Transcript of Criminal Cause for Suppression Hearing ("Tr."), Dkt. --, May 23, 2014 at 7, 12). In addition to Agent Maguire, Special Agents Christopher Heck and Susan Ruiz of Homeland Security Investigation (collectively "the agents") conducted the arrest. (Tr. at 9–10). After first attempting a "ruse"[2] to get the Defendant to voluntarily go to the Department of Homeland Security's field office in New York, New York ("HSI"), (Tr. at 22–23), the agents went to the Defendant's home and asked him to come outside and speak with them. (Tr. at 7). Once the

---

[1] The Defendant's affidavit states that after he asked to speak to a lawyer, "agents continued to ask me questions over the period that followed about the visa application, [his] daughter's relationship with her husband Babar, her leaving Pakistan and coming to the United States, and the murder of relatives of Shujat Abbas." (Def.'s Mot. to Suppress, Dkt. 57, Affidavit of Mohammad Ajmal Choudhry ¶ 3).

"At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980); *see also United States v. Thompson*, 10-CR-94, 2010 WL 3069668, at *5 n.1 (S.D.N.Y. July 29, 2010) (Rakoff, J.). "In practice, however, the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing." *Thompson*, 2010 WL 3069668 at *5 n.1 (citing *United States v. Polanco*, 37 F.Supp.2d 262, 264 n. 4 (S.D.N.Y. 1999) (Rakoff, J.)) (internal quotations omitted). When a defendant chooses "not to testify at the evidentiary hearing, the assertions in his affirmation can neither be tested by cross-examination nor corroborated by the Court's observation of his demeanor." *Id.* at *5. "[T]hough [the] defendant's decision not to testify may itself not be held against him, his hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much in the absence of corroboration, whether from the defendant or otherwise." *Id.*

[2] Agent Maguire initially called the Defendant's home and asked him to come to "police" offices to discuss an incident related to the Defendant's job as a taxi driver. (Tr. at 23). The agents used this ruse in order to avoid making the arrest at the Defendant's home because approximately ten people, including many children, lived there. (Tr. at 23).

Defendant presented himself, he was taken off the property, placed under arrest, and informed that he was being arrested for visa fraud and making interstate threats.[3] (Tr. at 7).

The Defendant was then placed in the agents' vehicle and asked if he could speak English. (Tr. at 8). After the Defendant orally confirmed his ability to speak English, Agent Maguire asked the Defendant if he had any medical issues or took any routine medicine. (Tr. at 8). The Defendant appeared to understand the questions and provided Agent Maguire with his medical history in English. (Tr. at 8). The agents then obtained the Defendant's identification documents, passport, driver's license, medications, and cell phone from his family members. (Tr. at 8–9).

As the agents were transporting the Defendant to HSI, the Defendant was asked a number of "pedigree" and background questions necessary for booking. (Tr. at 9–10). These questions sought "biographical information, familial relationships, scars, marks, tattoos, prior arrests or criminal records" as well as "emergency contact[s, and the] name of [his] physician." (Tr. at 10). The Defendant was not read his *Miranda* warnings at this point, but none of the agents asked the Defendant any substantive questions about the case or charges he was facing. (Tr. at 11). Agent Maguire testified that the agents did not "Mirandize" the Defendant during the car ride because they had no intention of questioning him and "just wanted to get him into custody and get him to [HSI]." (Tr. at 11).

Once at HSI, the Defendant was given an opportunity to use the restroom and offered food and water. (Tr. at 12). The Defendant accepted the water and was brought to an interview room at approximately 9:35 pm. (Tr. at 12, 34). The agents and Investigative Analyst Alex Cooper were present in the interview room. (Tr. at 12–13). Agent Maguire provided the

---

[3] On September 20, 2013, a Superseding Indictment was filed in this case adding a count for conspiracy to commit murder in a foreign country. (Dkt. 45, Sept. 20, 2013).

Defendant with an explanation of why he was arrested, a brief overview of what would happen that evening, and again asked about his English language skills. (Tr. at 13). The Defendant confirmed that he was comfortable having a conversation in English and that he could read and write in English. (Tr. at 13). Agent Maguire also offered the Defendant the services of an interpreter and informed him that one could be called at any time if he did not understand what was being asked. (Tr. at 13). The Defendant responded that "he could read, write, and speak English and had no question[s]." (Tr. at 14).

Agent Maguire orally read the Defendant his *Miranda* rights verbatim from the Homeland Security "Statement of Rights" form (Gov. Ex. 1) and asked the Defendant if he understood those rights. (Tr. at 14). The Defendant responded he understood his rights. (Tr. at 14). Agent Maguire then followed his practice for arrestees for whom English is a second language and asked the Defendant "to read each line, line by line [on the Statement of Rights form], and also to summarize for [the agents] in [the Defendant's] own words what he thought the line meant." (Tr. at 14, 16). While Agent Maguire could not recall the specific formulations that the Defendant used to summarize his rights in his own words, Agent Maguire testified that the Defendant summarized his rights in English and initialed "CH" next to each right listed on the form after summarizing it. (Tr. at 16–17, 40–41).[4] The session was not recorded. (Tr. at 16).

Following the issuance of the *Miranda* warnings, Agent Maguire inquired whether the Defendant would be willing to participate in an interview. (Tr. at 17). The Defendant responded that "he would be willing to speak about the visa but not about Pakistan." (Tr. at 17). Agent Maguire responded that the agents would be willing to talk to the Defendant about whatever topics he chose, but before doing so, the Defendant would have to waive his rights. (Tr. at 17).

---

[4] The Court finds that the Defendant understood and comprehended his *Miranda* rights.

Agent Maguire then read the Defendant the waiver of rights at the bottom of the Statement of Rights form[5] and again had the Defendant read his *Miranda* rights out loud and summarize them in his own words. (Tr. at 17–18). At this time, approximately 9:45 pm, after explaining he would be willing to speak about the visa but not about Pakistan, the Defendant stated that he wanted a lawyer. (Tr. at 18–19).

Agent Maguire acknowledged that the Defendant had asked for a lawyer and explained that he would not have a lawyer immediately, he would be brought to the jail for the night, be brought to the courthouse the next day, and would meet with a lawyer prior to any court proceedings. (Tr. at 19). The agents were preparing to move the Defendant to the processing area when the Defendant began to make unprovoked, spontaneous statements to the agents. (Tr. at 19). The statements were substantive and incriminating.[6] (Tr. at 19).

At a point when the Defendant paused, Agent Maguire explained to the Defendant that, having asked for a lawyer, the agents would neither ask him any questions at that point nor at any time until he met with a lawyer. (Tr. at 20). The Defendant continued to make statements for a period of time after this warning until Agent Ruiz interrupted him. (Tr. at 20). Agent Ruiz reminded the Defendant that had asked for a lawyer and he would not be asked any questions

---

[5] The waiver reads: "I have read this statement of my rights, and I understand what my rights are. At this time I am willing to answer questions without a lawyer present." (Gov. Ex. 1).

[6] The Defendant's declarations covered the following topics: his daughter's arranged marriage; accusations that Shujat Abbas blackmailed his daughter; accusations that Abbas escaped from a Dubai jail; accusations that Abbas attempted to win over his daughter to obtain a United States visa; a statement that "he has no control over other events in Pakistan"; the suggestion that Abbas's debtors had arranged for the murder of Abbas's relatives in Pakistan; a claim that "he did not know who killed people in Pakistan, despite a police report filed by Abbas'[s] relatives stating that [the Defendant's people] were responsible for the murder of Abbas'[s] relatives"; an admission to filing the U.S. visa petition for his daughter's husband; an explanation of his motive for filing the visa petition; an admission that he "might have said [to his daughter that] if you don't come home I'll kill the boy"; and an admission that his brother "might have been" at the scene of the shooting of Abbas's relatives. (Def.'s Mot. to Suppress, Dkt. 57, Ex. B).

without a lawyer. (Tr. at 20). Agent Ruiz pointed to the Statement of Rights form and reminded the Defendant that if he wanted to speak with the agents, he could waive his rights. (Tr. at 20). Following this warning, the Defendant "thought for a moment and then reaffirmed that he wished to speak to a lawyer prior to speaking to [the agents]." (Tr. at 20). The agents then brought the Defendant to the processing area. (Tr. at 20). It was approximately 9:59 pm. (Tr. at 55–56).

In total, the Defendant spoke for approximately ten minutes. (Tr. at 21). The entire interaction from when he was put into the interview room to when the agents brought him to the processing area was approximately 20 minutes long. (Tr. at 21). Agent Maguire described the Defendant's demeanor as "very cool, calm, collected, reasonable." (Tr. at 21). At no time did the agents or Investigative Analyst Cooper ask the Defendant any substantive questions, interrogate the Defendant, or elicit any substantive responses from the Defendant. (Tr. at 20–21).

## CONCLUSIONS OF LAW

The Defendant seeks the suppression of two sets of statements. *First*, the Defendant seeks to suppress the statements made in response to the pedigree and background questions posited to him before being issued his *Miranda* rights. The Government responds that any questions asked during this period were routine booking questions, exempt from *Miranda*'s bar on interrogation prior to a defendant being read his rights. *Second*, the Defendant seeks to suppress the incriminating statements he made following the invocation of his Fifth Amendment right to counsel. The Government contends that the statements were made spontaneously and that the agents neither asked questions nor engaged in any behavior to elicit substantive responses from the Defendant, thereby evading the rule in *Edwards*. The Court agrees with the Government and the Defendant's motion to suppress is denied.

Case 1:13-cr-00150-WFK Document 75 Filed 06/06/14 Page 7 of 12 PageID #: 500

### A. *Pedigree and Booking Questions Are Not Subject to* Miranda's *Bar on Interrogation*

The agents' questions to the Defendant after his arrest and prior to the reading of his *Miranda* rights consisted exclusively of standard booking questions or questions related to his pedigree. No questions were asked concerning the substantive offenses with which the Defendant was charged. The Defendant's affidavit in support of his motion to suppress does not refute this point. (Def.'s Mot. to Suppress, Dkt. 57, Affidavit of Mohammad Ajmal Choudhry ¶ 2) ("As we sat in the vehicle near my home, agents in the vehicle proceeded to ask me a number of questions about me and my family. . . These questions continued as I was transported to the agents['] office in Manhattan.").

"[R]outine booking question[s] . . . to secure the biographical data necessary to complete booking or pretrial services" are exempt from *Miranda*'s coverage. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). "The collection of biographical or pedigree information through a law enforcement officer's questions during the non-investigative booking process that typically follows a suspect's arrest . . . does not ordinarily implicate the prophylactic protections of *Miranda,* which are designed to protect a suspect only during investigative custodial interrogation. Such interrogations customarily involve questions of a different character than those that are normally and reasonably related to police administrative concerns." *Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) (citing *Muniz*, 496 U.S. at 601–02). These *Miranda*-exempt background questions can include questions about the arrestee's identity, date of birth, address, telephone number, employment status, family and marital status, *United States v. Gotchis*, 803 F.2d 74, 78–79 (2d Cir. 1986), and health information, *see United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995) (finding that questions regarding the arrestee's limp were "part of the booking procedure designed to fulfill the government's obligation to provide medical

attention if necessary"); *see also United States v. Rodriguez*, 07-CR-699, 2008 WL 52917, at *2 n.4 (S.D.N.Y. Jan. 2, 2008) (Baer, J.) ("Pedigree includes information such as name, date of birth, education, and health statistics.").

Prior to being read his *Miranda* rights, the agents' questions to the Defendant were limited to: whether he had any medical issues, whether took any routine medicine, biographical information, family relationships, whether he had any scars, marks, or tattoos, prior arrests, criminal records, emergency contacts, and the name of his physician. These questions were intentionally limited to the information the agents needed to complete the Defendant's booking and processing into custody. The testimony is clear that the agents consistently avoided substantive interrogation with full knowledge that the Defendant had not yet been read his rights under *Miranda*. In fact, the questions asked by the agents were the quintessential "[r]outine questions about a suspect's identity . . . ordinarily innocent of any investigative purposes . . . normally attendant to arrest and custody." *Gotchis*, 803 F.2d at 794 (internal quotations and citations omitted). These questions did not violate the Defendant's constitutional rights and the motion to suppress the Defendant's responses is denied.

### B. *Spontaneous Statements by a Defendant Who Has Invoked His Right to an Attorney Will Not Be Suppressed*

The Fifth Amendment requires that an arrestee be advised of his right to have an attorney present prior to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966) (holding that once the right to counsel in invoked, "the interrogation must cease until an attorney is present"). Once an arrestee has invoked his Fifth Amendment right to counsel, there is an absolute bar on police interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85

(1981); *see also United States v. Medunjanin*, --- F.3d ----, 2014 WL 2054016, at *8 (2d Cir. 2014); *United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012). An arrestee who invokes his right to counsel, but then initiates an unsolicited conversation with police, cannot successfully suppress those statements from trial. *See United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992) (denying the suppression of "spontaneous and unsolicited declaration[s]" by the arrestee who "clearly initiated the conversation" with an agent after invoking his *Miranda* rights); *United States v. Colon*, 835 F.2d 27, 30–31 (2d Cir. 1987) (upholding district court's finding that the arrestee's "statement was spontaneous and not the product of an interrogation or its functional equivalent" and that arrestee was "not questioned, confronted with evidence, or even encouraged to be honest and tell the facts"); *United States v. Cohen*, 372 F. Supp. 2d 340, 361 n. 9 (E.D.N.Y. 2005) (Azrack, M.J.) (denying the suppression of statements when the agent "had not asked defendant any questions or made any comments to elicit the statements[,]" and the defendant "made spontaneous statements about the predicament in which he found himself"); *see also United States v. Annuci*, 2007 WL 1310156, at *5–6 (S.D.N.Y. May 3, 2007) (Jones, J.) (holding that "agents did not solicit or 'lure' Defendant into conversation" and that spontaneous statements made by defendant were admissible as volunteered statements resulting from "a conversation initiated by the Defendant"). "The Government has the burden of proving by a preponderance of the evidence that a defendant made his statements spontaneously and not as the result of custodial interrogation." *Annucci*, 2007 WL 1310156, at *4 (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)).

The Government has met and exceeded its burden in this case. The evidence established that once the Defendant invoked his right to counsel, the agents strictly refrained from asking the Defendant any questions about the case or taking any actions to elicit statements from the

Defendant. Immediately following the Defendant's invocation of his rights, the agents prepared to leave the interview room. For reasons only known to the Defendant, he then began to make spontaneous, unprovoked, and incriminating statements, at first, related to the visa charge and then the events in Pakistan. The Defendant spoke at length, for approximately ten minutes, and in English, concerning various aspects of the charges. Instead of engaging in this conversation, the agents twice reminded the Defendant that he had invoked his right to counsel and that they would not ask him any questions. At no point during the Defendant's tirade was he improperly "questioned, confronted with evidence, or even encouraged to be honest and tell the facts." *Colon*, 835 F.2d at 31.

The arguments made in the Defendant's post-hearing letter are to no avail.[7] Despite attempts to read a temporal or geographical requirement into the governing cases, the Defendant's position is without support. The caselaw does not require an analysis of where or how long it took for an arrestee to make his spontaneous statements after invoking his rights. *See Montana*, 958 F.2d at 519 (finding that the arrestee's initial spontaneous statements were admissible without further inquiry). Instead, the issue turns on the conduct of the officers

---

[7] The Defendant's letter to this Court argues that it is nonsensical that the Defendant would state that "he would be willing to speak about the visa but not about Pakistan," (Tr. at 17), invoke his right to counsel, and then moments later begin spontaneously discussing Pakistan. (Def.'s Post-Hearing Letter, Dkt. 68, May 30, 2014 at 1). However, Agent Maguire's notes, submitted to this Court as Exhibit B to the Defendant's motion, indicate that the Defendant first talked at length about issues related to the visa and only towards the end of his ten minute statement did he touch upon the murders in Pakistan and the threats he made to his daughter. (Def.'s Mot. to Suppress, Dkt. 57, Ex. B). It is entirely possible that once the Defendant began speaking, his narrative ventured off into the closely-related topic of the events in Pakistan in an attempt to provide support for his profession of innocence. Furthermore, it is also possible that during his ten-minute, barely interrupted monologue, the Defendant changed his mind and decided he wanted to discuss matters related to events in Pakistan. In fact, had Agent Ruiz not interrupted the Defendant to remind him that he had invoked his right to counsel, he may have continued to make incriminating statements about the threats and events in Pakistan. Instead, upon reflection, the Defendant reiterated that he wanted to consult an attorney. (Ex. B). In any event, in the face of the consistent and credible testimony of Agent Maguire, the bare assertion that the Government's presentation is nonsensical does not undermine the persuasiveness of that presentation to this Court.

following the arrestee's invocation of his rights. When the agents ask no interrogative questions and refrain from conduct that could lure the arrestee into speaking, there is no violation of the arrestee's rights. *See Montana*, 958 F.2d at 519; *Colon*, 835 F.2d at 30–31; *Cohen*, 372 F. Supp. 2d at 361 n. 9. If the arrestee begins to spontaneously make statements, no matter how long after or how far from the arrestee's invocation of his right to counsel, those statements will not be suppressed at trial.

In *Montana*, the arrestee invoked his *Miranda* rights, but was then impermissibly interrogated by agents during a drive from Drug Enforcement Agency headquarters to the courthouse. *Montana*, 958 F.2d at 518. Thereafter, the arrestee spontaneously began a conversation with an agent while sitting in the magistrate judge's courtroom. *Id.* at 519. The agent followed up on the arrestee's statement by asking him a number of follow-up questions. *Id.* The *Montana* court discussed the location and timing of the spontaneous statements only because of its prior holding that the questioning during the drive constituted "impermissible interrogation." *Id.* In light of this interrogation, the agent's follow-up questions to the arrestee's spontaneous statements were only permissible if the arrestee validly waived his rights. *Id.* However, the court made clear that the arrestee's *initial* spontaneous and unsolicited declaration was admissible regardless of whether the *subsequent* statements in response to the agent's questioning were. *Id.* In sum, timing and location were only considered by the court to determine whether the spontaneous statements constituted a voluntary waiver justifying the agent's subsequent questioning. *Id.* ("The circumstances of the [earlier] impermissible interrogation . . . were sufficiently remote from the questioning that followed the volunteered comment in the hearing room to remove the possibility that this episode rendered Montana's waiver involuntary."); *see also Maryland v. Shatzer*, 559 U.S. 98, 104–05 (2010) (explaining that

—11—

the "rationale of *Edwards* is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, *and not at the suspect's own instigation*, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect.'") (emphasis added) (internal citations omitted). As the agents here did not interrogate the Defendant,[8] even after he began making spontaneous statements, the Defendant's proposed analysis is unnecessary. Truly spontaneous and unsolicited declarations without officer interrogation or its functional equivalent will not be suppressed, even if they occur after the arrestee requests counsel. *See Edwards*, 451 U.S. at 484–85.

Accordingly, the Defendant's spontaneous and unprovoked statements, made after asserting his right to counsel, will not be suppressed.

## CONCLUSION

The Defendant's motion to suppress statements is DENIED in its entirety.

SO ORDERED

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 6, 2014
Brooklyn, New York

---

[8] In fact, the only statements made by the agents after the Defendant began speaking were reminders that he had invoked his right to counsel and that the agents would not ask him any questions unless he wanted to sign the waiver of rights section of the Statement of Rights form. (Tr. at 20).