1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
        UNITED STATES OF AMERICA,    :   13-CR-150(WFK)
 4                                   :
                                     :   U.S. Courthouse
 5                                   :   Brooklyn, New York
             -against-              :
 6                                   :   TRANSCRIPT OF
                                     :   PRETRIAL CONFERENCE
 7                                   :
                                     :
 8      MOHAMMAD CHOUDHRY,            :   June 9, 2014
                                     :   10:30 a.m.
 9           Defendant.              :
                                     :
10      - - - - - - - - - - - - - X

11    BEFORE:
                     HONORABLE WILLIAM F. KUNTZ II, U.S.D.J.
12
      APPEARANCES:
13
      For the Government:       LORETTA E. LYNCH, ESQ.
14                              United States Attorney
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201
                                BY:  AMANDA HECTOR, ESQ.
16                                   RICHARD TUCKER, ESQ.
                                     MARGARET GANDY, ESQ.
17                                   Assistant U.S. Attorneys

18
      For the Defendant:        FREDERICK SOSINSKY, ESQ.
19


20
      Punjabi Interpreter:      Upi Sharma
21

22    Court Reporter:           Holly Driscoll, CSR
                                Official Court Reporter
23                              225 Cadman Plaza East
                                Brooklyn, New York 11201
24                              (718) 613-2274

25    Proceedings recorded by mechanical stenography, transcript
      produced by Computer-Assisted Transcript.
```

2

1        THE COURTROOM DEPUTY:  We're here for a criminal

2    pretrial conference, docket number 13-CR-150, USA versus

3    Choudhry.

4        Counsel, may you please state your appearances for

5    the record, spell your names for the court reporter, including

6    the interpreter.

7        MS. HECTOR:  Your Honor, I believe that Mr. Sosinsky

8    is perhaps bringing his client out.

9        THE COURT:  Well, I certainly don't see him, nor do

10   I see his client so we'll just abide the event.  I'm not about

11   to proceed in a criminal case without the defendant present.

12       (Pause.)

13       (Defendant enters courtroom with Mr. Sosinsky and

14   the marshals.)

15       THE COURT:  Mr. Jackson, would you please call the

16   case.

17       THE COURTROOM DEPUTY:  We're here for a criminal

18   pretrial conference, docket number 13-CR-150, USA versus

19   Choudhry.

20       Counsel, may you please state your appearances for

21   the record, spell your names for the court reporter, including

22   the interpreter please.

23       MS. HECTOR:  Yes.  Amanda Hector, Rich Tucker and

24   Maggie Gandy for the government.  Hector is H-E-C-T-O-R,

25   Tucker is T-U-C-K-E-R, and Gandy is G-A-N-D-Y.

1          Good morning, Your Honor.

2          THE COURT:  Good morning.  You may be seated.

3          MR. SOSINSKY:  Good morning, Your Honor, for

4   Mr. Choudhry, Fred Sosinsky.  S-O-S-I-N-S-K-Y is the spelling

5   of my last name.  Mr. Choudhry is here in court.  We have the

6   interpreter next to us.

7          THE COURT:  Good morning.

8          And the interpreter, would you state your name

9   please.

10          THE INTERPRETER:  Interpreter's name is Upi Sharma.

11          THE COURT:  Would you spell that.

12          THE INTERPRETER:  S-H-A-R-M-A.

13          THE COURT:  Thank you.

14          Mr. Jackson, would you please swear the interpreter.

15          THE COURTROOM DEPUTY:  Yes, Your Honor.

16          (Interpreter sworn by the courtroom deputy.)

17          THE COURT:  Thank you.  You may be seated.  And

18   ladies and gentlemen in the public gallery, you may be seated

19   as well.  All right.

20          We are here on a pretrial conference in the action

21   of United States of America versus Choudhry.  There are a

22   number of issuing that the Court anticipates the parties will

23   need to discuss but rather than the Court playing guess with

24   respect to the issues, I think I'll ask the prosecution to go

25   through their issues and the defense to respond with respect

4

1   to those issues and then we can take them seriatim.  If

2   there's anything on my list that you haven't addressed, we

3   can touch on it.  Just at 30,000 feet, my list includes the

4   issues concerning proposed expert witness testimony, motions

5   in limine, foreign witnesses who are unwilling and/or unable

6   to come to the United States, the proposed voir dire that

7   we're expecting to receive later today, outstanding discovery,

8   if any, 3500 material, the question of the trial date, the

9   question of jury selection date and any issues that arise from

10  the second superseding indictment which was filed on June 6

11  and has been reviewed by this Court which had additional facts

12  relating to Count One.

13          So, that's the sort of general overview, but start

14  with you, Ms. Hector, tell me what you want to talk about.

15          MS. HECTOR:  Certainly, Your Honor.  Perhaps the

16  first order of business should be arraigning the defendant on

17  the superseding indictment.  As the Court I'm sure is aware,

18  the only differences between the last superseding indictment

19  and this, which is S-2, is the addition of several overt acts

20  to Count One, which is the conspiracy charge, and specifically

21  those overt acts are now alleged as e, f, g and j, and they

22  are comprised of the consensually recorded telephone calls,

23  which obviously the defendant has had for some time now,

24  between his daughter and himself.

25          THE COURT:  All right.  Let me turn to defense

5

1    counsel.  Would you like the Court to read the superseding

2    indictment and to ask the defendant how he pleads with respect

3    to the superseding indictment -- first of all, have you

4    received the superseding indictment, sir?

5               MR. SOSINSKY:  I have.

6               THE COURT:  Have you reviewed it?

7               MR. SOSINSKY:  I have.

8               THE COURT:  And have you reviewed it with your

9    client?

10              MR. SOSINSKY:  I have reviewed it with my client

11   both with the services of the court interpreter and myself.

12   He has physically seen the new indictment and had the changes

13   explained to him this morning.

14              THE COURT:  All right.  Well, would you like me to

15   read the superseding indictment to him in its entirety so

16   there is no confusion for my friends on the 17th floor as to

17   the fact that he indeed was arraigned with respect to the

18   superseding indictment or do you think that's not necessary?

19              MR. SOSINSKY:  We would waive that request, Your

20   Honor.  I've been over it with him and I'm prepared to enter a

21   plea of not guilty on the superseding indictment on his behalf

22   with the Court's permission.

23              THE COURT:  Yes.

24              Madame prosecutor, is that acceptable?

25              MS. HECTOR:  Yes, Your Honor.

6

1          THE COURT:  Then the plea of not guilty with respect

2    to the superseding indictment is entered.

3          MS. HECTOR:  Your Honor, perhaps the next order of

4    business should be we're aware of the new trial date which is

5    June 23rd, I believe that there's a joint request from defense

6    and the government to have jury selection proceed on June 16th

7    for several reasons.  One, it's a jury return date.  I know

8    that that's not dispositive but it is certainly sort of easier

9    for court personnel.  Two, we are anticipating at this point

10   that the trial, both the government's case and the defense

11   case, will be finished inside of two weeks.  That would mean

12   that we would be finished prior to the July 4th holiday but

13   getting close to it.  Because of that, we're anticipating that

14   there may be a significant number of jurors who raise an issue

15   with serving on the jury because of vacation perhaps and the

16   like.  For that reason, we also think that it would be

17   beneficial to get a running start June 23rd in the morning

18   with opening statements and witnesses having already taken

19   care of jury selection with the understanding that jury

20   selection may take a little bit longer because there will be

21   people who have vacation plans.  So, for those reasons, I

22   think there's a joint request to do jury selection on June 16.

23          THE COURT:  Let me hear from defense counsel.

24          MR. SOSINSKY:  We have no problem with that request,

25   we are prepared to move forward with jury selection --

7

1          THE COURT:  I'm going to ask you to use the

2     microphone, sir.

3          MR. SOSINSKY:  We would have no problem going ahead

4     with jury selection next week and then beginning with

5     testimony and opening statements before testimony the

6     following Monday.

7          THE COURT:  All right.  I am inclined to grant the

8     application since it is a joint application and since the

9     holiday is looming.  I am a little bit concerned about

10    interaction or the potential for interaction with identified

11    jurors in the week between jury selection and the start of the

12    trial because there will be some press attention to this case

13    and I worry about the fact that this is not an anonymous jury

14    and I worry about the fact that we have an intervening week.

15          Ordinarily it is the practice of this court, as you

16    may or may not know, to pick and go, we pick the jury and we

17    go.  So, I am voicing a concern.  If it is not a concern of

18    the prosecution and if it is not a concern of defense counsel,

19    if you state that on the record, then I will be inclined to

20    grant your application.

21          MS. HECTOR:  Your Honor, at this point that's not a

22    concern of the government.  Obviously if someone were to raise

23    an issue during that time period, we would address it.  Sort

24    of slightly differently than that, of course we would expect

25    that the Court would instruct the jury that they are not to do

8

1    any sort of research, they're not to do any sort of online

2    looking.

3          THE COURT:  I know but as I'm well known for saying,

4    if you tell people not to think about a rhinoceros, they tend

5    to think about a rhinoceros.  So, I'll certainly give them a

6    cautionary instruction.

7          All right.  I'll hear from defense counsel.

8          MR. SOSINSKY:  We concur with the government, Judge,

9    we have no particular issue.

10         THE COURT:  We will then begin jury selection at

11   9:30 a.m. on Monday, June the 16th.  We'll select the jury

12   here in this courtroom.  I would anticipate that we will have

13   a pool of between 100 and 150 jurors to pick from.

14         Do you think that's sufficient?

15         MS. HECTOR:  I think that would be sufficient, Your

16   Honor.

17         MR. SOSINSKY:  Yes.

18         THE COURT:  Okay.  All right.  Next item.

19         MS. HECTOR:  Your Honor mentioned 3500.  As Your

20   Honor is aware, while it is not required under the rules, it's

21   our office's practices to provide 3500 a week in advance.

22   Given that the trial has moved a week, we would propose that

23   we provide that to defense counsel a week in advance of trial.

24         THE COURT:  A week in advance of trial meaning?

25         MS. HECTOR:  Meaning the day of jury selection,

1    June 16th.

2         THE COURT:  Well, today is June the 9th, so you're

3    talking about --

4         MS. HECTOR:  A week from today.

5         THE COURT:  A week from today.  I just didn't want

6    there to be any confusion about that because some people say

7    the trial starts when you select the jury.

8         MS. HECTOR:  Certainly, Your Honor.

9         THE COURT:  Well, some people, not necessarily me.

10   How about defense counsel, what is your view on that?

11        MR. SOSINSKY:  I concur with Your Honor's final

12   statement about when the trial begins.

13        THE COURT:  I'm just observing that there are

14   different views about when the trial begins.  Having said

15   that, are you comfortable receiving the 3500 material on the

16   23rd?

17        MR. SOSINSKY:  The 16th.

18        THE COURT:  The 16th.

19        MR. SOSINSKY:  The 16th is what's being offered,

20   right, as compared with what our prior agreement so ordered

21   by the Court had been.  I am not comfortable with it but I

22   understand what the timing had been pursuant to that

23   agreement.  I'm not sure why at this juncture, also bearing

24   in mind an issue we'll turn to in a moment about having to go

25   out and find an expert in light of the disclosure from the end

1  of last week, why the government would not want us to be

2  better prepared.

3          THE COURT:  You know what happens to district court

4  judges who try to tell the government when to turn over 3500

5  material.

6          MR. SOSINSKY:  They get listened to.

7          THE COURT:  Well, I think what we'll do is you'll

8  turn it over, on or before what date?

9          MS. HECTOR:  June 16th, Your Honor.

10          THE COURT:  On or before June 16th it will be turned

11  over to the defense counsel.

12          Next item.

13          MS. HECTOR:  The next item, Your Honor, with respect

14  to foreign witnesses, the parties are proceeding tomorrow

15  morning with a Rule 15 deposition of the one Pakistani witness

16  who was unwilling to travel to the United States and with

17  respect to the defendant's other proposed witnesses, the

18  government has made arrangements to provide a special parole

19  for those witnesses to come to the United States to testify

20  and everything is proceeding as planned with respect to that

21  and so we fully anticipate that those witnesses will appear

22  for trial.

23          THE COURT:  Now, let's talk about the logistics

24  of that.  Where will the lawyers be when the deposition is

25  held?

11

1          MS. HECTOR:  The lawyers and the defendant himself

2     will be present at our offices.

3          THE COURT:  Our offices being?

4          MS. HECTOR:  The U.S. Attorney's Office and the

5     deposition will take place over what's called a VCT network.

6          THE COURT:  Which stands for?

7          MS. HECTOR:  I believe video teleconferencing.  So,

8     the parties will all be able to see each other, it will be

9     videotaped and it will be simultaneously transcribed by a

10    court reporter so there will be a transcript, and then I

11    expect that the parties will probably have some applications

12    to the Court, may or may not, about which portions of that

13    deposition will be admissible at trial and that sort of thing

14    but that cannot be anticipated until we actually have the

15    deposition.

16         THE COURT:  Is that your understanding as well?

17         MR. SOSINSKY:  Yes, sir.

18         THE COURT:  Now, this testimony obviously will be

19    open to the public including the press, is that right?

20         MR. SOSINSKY:  Once the testimony itself is offered

21    as would be any other testimony during the course of the

22    trial, then it would be.

23         MS. HECTOR:  Yes, Your Honor.

24         THE COURT:  The deposition is what I'm asking about,

25    is that open to the public or not?

1    MS. HECTOR:  The deposition in our offices, no, but

2  to the extent that it is offered in court during the trial as

3  part of the trial, that will be open to the public to view.

4    THE COURT:  What is the defendant's view of that?

5    MR. SOSINSKY:  That's consistent with our

6  understanding, Your Honor.

7    THE COURT:  All right.  So, the deposition will not

8  be open to the public but obviously the portions of the

9  testimony that are offered and that are admitted at trial

10  will, of course, be part of the public record.

11    MS. HECTOR:  Yes.

12    MR. SOSINSKY:  Yes, sir.

13    THE COURT:  I want to make that clear.

14    MR. SOSINSKY:  Yes, sir.

15    THE COURT:  And that's by agreement of the parties.

16    All right.  What's next?

17    MS. HECTOR:  Your Honor, I think what's next is

18  probably the government moved in limine to admit several

19  categories of evidence at trial.  The government, as set

20  forth in our papers, believes that all of the evidence that

21  we set forth in that motion or categories of evidence are

22  admissible and proper evidence as part of this trial.  I

23  believe Mr. Sosinsky agrees with some of it and disagrees with

24  other portions of it.

25    THE COURT:  Sir.

1          MR. SOSINSKY:  Yes, Your Honor.  As I've written to

2     the Court last week, there are certain items submitted in

3     connection with the government's memorandum that we would not

4     object to their admission and we've taken them seriatim in our

5     submission.  In particular, the videotapes that were taken or

6     the portions of videotapes taken during the course of --

7          THE COURT:  During the wedding celebrations with the

8     firearms.  Look, I think that, just to make life easier for

9     both sides, I'm going to admit the videos; to the extent that

10    you can agree on language of a limiting instruction, and both

11    of you talked about that possibility, you are encouraged to

12    see if you can stipulate to the limited use.  If you can't,

13    then just give me your respective submissions and I will

14    create my own new and improved limiting instruction with

15    respect to the purposes for which the video is being offered

16    such as showing relationships, showing familiarity with

17    firearms, but not necessarily offered to show that any local

18    firearms statutes have been violated.  There are many parts

19    of the world where people fire off guns in celebrations,

20    including in our own country.

21          So, to the extent that you can agree on a limiting

22    instruction with respect to the video, you should do so.  If

23    you can't, I'll earn my pay and give a limiting instruction,

24    all right, but the video is going to come in and I'm not going

25    to redact it, I'm going to show the whole thing.  Okay.

1        You also have the question of -- do you want to talk

2   about experts now or what else do you want to address?

3        MS. HECTOR:  Perhaps we -- go ahead.

4        MR. SOSINSKY:  I think both sides have outlined

5   their positions with regard to other items contained within

6   the government's motion in limine.  I don't know if Your Honor

7   wants us to address that.

8        THE COURT:  Ms. Hector, why don't you go through

9   them.

10       MS. HECTOR:  Certainly.  The next category would be

11  co-conspirator statements.  There's various conspiracies,

12  charged and uncharged, and the government submits that the

13  types of statements outlined in our motion are all admissible

14  and proper.

15       THE COURT:  Those are coming in, the co-conspirators

16  in furtherance of the conspiracy, those statements are coming

17  in.  You can argue what you want to argue about them but

18  they're going to come in.  Juries are smart, they sort this

19  out, that's why we have juries.

20       MS. HECTOR:  The next issue, Your Honor, is the

21  defendant's statement regarding a prior incident, this is a

22  statement on consensual recordings between the defendant -- in

23  the defendant's own voice between the defendant and his

24  daughter in which, in the context of talking to his daughter

25  and threatening her and sort of interstate threats, of course

1    as Your Honor knows, is one of the charges in the indictment,

2    one of those threats is that he explains to her that he has

3    previously taken action to shoot at other individuals in

4    response to an affront to his honor and will do so again.

5           The government's position is that this is direct

6    evidence of the crime of transmission of interstate threats.

7    The defendant's statement is a threat in and of itself and so,

8    it is the crime charged.  There's no multiple threats

9    throughout those calls but this is one of them.  So, the

10   government's position is that it is absolutely admissible

11   because it is direct evidence.

12          In addition, we will be submitting jury

13   instructions in the next day or two and one of the

14   instructions specifically with respect to the threat charge

15   is that the government needs to show that the person who

16   heard the threat understood it to be a true threat.  That's

17   not -- I think the defendant is confused with the issue a

18   little bit and says that the government then needs to show

19   that the defendant in fact previously shot at other

20   individuals.  That's not what the government needs to show.

21   What the government needs to show is that the listener

22   objectively, based on the listener's understanding of the

23   context, understood it to be a true threat and the fact that

24   the defendant is referencing a prior incident that the

25   listener was aware of of an issue involving her sister goes to

1  show that Amina, the daughter, took the defendant's words as

2  true, not a joke, not a sort of hyperbole but a very true

3  threat and so for that reason as well it comes in.

4          THE COURT:  Your response?

5          MR. SOSINSKY:  First of all, I think both sides

6  agree that the language -- the case was cited in the

7  government's papers, but the language in United States

8  versus Sovie will be matters for which the Court will be

9  instructing the jury in this case and evaluating whether or

10 not these are real threats or otherwise.

11         The government just made mention, Your Honor, of the

12 defendant threatening her, meaning his daughter, during the

13 course of this call or calls and in that regard, I wanted to

14 point out, I think I did in my papers, he's not charged with

15 that.  Count Three concerns, as I read it and as I understand

16 it, threats that were made regarding the family of what's

17 referred to as John Doe in the indictment but that we now

18 understand to be the family of Shujat Abbas for the reasons

19 that the government has proffered allegedly.

20         The government I don't believe makes the claim that

21 whatever it is that the defendant was talking about in

22 speaking during this conversation with his daughter is real

23 itself, meaning there's no evidence, nor do they claim, at

24 least so far, that he ever or anyone on his behalf ever shot

25 at anybody years back and we're talking many, many years

1    before this when there was an issue with one of Amina's

2    sisters, one of my client's older daughters, for a single

3    night here in Brooklyn.  I think that's something that the

4    Court needs to consider in evaluating whether or not, even if

5    you accept the argument that it's relevant, whether or not the

6    prejudicial impact outweighs whatever relevance or probative

7    value it has.

8            If the government, for example, was before you

9    arguing -- offering that this stuff took place and that the

10   listener knows that that's the case, that would be thing, but

11   beyond that I think what happens is it runs the real risk that

12   jurors, who Your Honor correctly notes are smart people and

13   can figure things out, would understand such a statement as

14   being -- especially since it concerns matters over in

15   Pakistan, which they're going to hear a lot of, real matters,

16   that is that something actually happened and they don't have

17   any evidence in that regard.  In fact, it didn't.  As I

18   understand, no such thing happened.

19           So, when Your Honor decides the issue of whether or

20   not to allow in -- and there's two classes of evidence, one is

21   the statements that are made but the other is a witness's

22   understanding about sort of the back story, what's being

23   discussed, I think Your Honor must weigh the prejudicial

24   impact of talking about something that never happened, I think

25   even according to the government, in weighing its probity.

18

1          THE COURT:  I'm going to let the statements in.  I
2    think that, again, juries are smart and they get it and to the
3    extent you want to argue that these events either did not
4    occur or the witness testifies and she believed the threat and
5    you can say, well, what was the basis of that belief, you'll
6    have plenty of room to go at the witness but in terms of
7    keeping the statements out, I think that that's not
8    appropriate and I'm going to let the statements in.
9          MR. SOSINSKY:  Would Your Honor entertain, as you
10   did for the evidence concerning firearms, a limiting
11   instruction?
12         THE COURT:  No.  I think this is a little bit
13   different.  I think the witness can testify with respect to
14   how the witness perceived the alleged threat, whereas with the
15   firearms, you've got people firing off AK-47s and people might
16   think that that's either a good thing or a bad thing.  I think
17   it's fair to say that in some cultures and in some places, as
18   I said, including portions of the United States -- you read
19   John Adams, he said that July 2nd would be a date that
20   Americans would fire off guns to celebrate the creation of
21   the American republic.  He was off by two days because it took
22   them two days to get all the signatures but in fact, and this
23   is where my Ph.D. burdens me with a little bit of knowledge,
24   that was part of our tradition going back to the founding
25   fathers, you know, John Adams, pretty patriotic guy, pretty

1    good president, pretty good lawyer, represented the Red Coats,

2    he did defense work as well as prosecution work.

3            No, it is going to come in and there will be an

4    appropriate limiting instruction with respect to the firearms

5    and the celebration but with respect to how a witness

6    perceived a threat, the witness will tell how she perceived

7    the threat and you'll have an opportunity to challenge that.

8            MR. SOSINSKY:  Your Honor, what about this issue

9    though that I raised separate and apart from that with regard

10   to who the threats as charged are directed at?  There's no

11   claim anywhere in the indictment --

12           THE COURT:  You can argue that to the jury.

13           MR. SOSINSKY:  No, no, of course I can, but I'm

14   hearing a different theory now is my point.  I don't know

15   whether the government is offering a different theory.  They

16   would be correct legally to argue that the defendant wanted

17   to impress upon his daughter the seriousness of his threats

18   vis-a-vis the so-called victims identified in the indictment,

19   that would be one thing, and Your Honor has ruled that you

20   concur with their argument.  It would be quite another if the

21   argument was that then, by virtue of those statements, he is

22   threatening her and that's my concern because that's not

23   charged conduct.

24           THE COURT:  Let's hear what the government has to

25   say about that nuance.

20

1          MS. HECTOR:  Your Honor, with respect to Count

2     Three, the government's theory is that the defendant was

3     threatening that if Amina did not return home, he would kill

4     and hurt members of the Abbas family.  So, if I misspoke or

5     was not clear, I believe our theory is consistent with how

6     defense counsel is presenting it right now.

7          THE COURT:  So, I guess there's nothing that

8     separates you two on that point, as I'm hearing it.

9          MR. SOSINSKY:  I just want to be clear on that

10    because -- and if we are, then we are, but that the government

11    is not arguing that in February of 2013 the defendant was then

12    threatening the life of Amina Choudhry if she did not come

13    back home.  There's no evidence of that and, in fact, every

14    statement made on tape is to the opposite effect.

15          MS. HECTOR:  I would say that with respect to the

16    recorded calls, and I believe this is somewhat argument that

17    needs to be made to the jury, but with respect to the recorded

18    calls, in the recorded calls the defendant's threats are to

19    the Abass family.

20          There are other portions, and we have outlined this

21    in our motion in limine, there are other times at which

22    threats were made to Amina's life and that is true in the

23    context of some of the other uncharged conspiracies but that's

24    sort of an independent issue than what's charged in Count

25    Three.

1          THE COURT:  Okay.  I think I've got it, I think we

2     should move on.  The statements are going to come in.

3               What else do we have?

4          MS. HECTOR:  Your Honor, statements of future

5     intent, the Hillman doctrine.  One thing I wanted to note,

6     it seems like the defense's issues with those statements are,

7     one, he had an issue that one of the statements he said lacked

8     sort of specificity, you know, sort of what the declarant's

9     stated intention was.  There's no requirement within Hillman

10    or the applicable Federal Rules of Evidence that the statement

11    of present intent have a certain level of specificity in terms

12    of who exactly the person is meeting with.  It is sufficient

13    if the person -- if the person testifies that he said he was

14    meeting with the Choudhry family, then that's what the

15    statement is.  But we'll see how it sort of -- what the

16    witness actually says.

17               But the other issue I had is the defense asked for a

18    limiting instruction that the evidence only come in to show

19    that the declarant acted in conformity therewith and that's

20    not actually the law.  There's a couple of cases and I can

21    state them for the Court, United States versus Best, 219 F.3d

22    192, a Second Circuit case in 2000, and United States versus

23    Cicale, a Second Circuit case from 1982, 691 F.2d 95, and

24    basically what those two cases hold is that the statements can

25    actually also come in to show that a non-declarant acted in

22

1    conformity therewith if there is independent evidence

2    corroborating that another non-declarant acted in conformity

3    therewith.  And we would argue that statements of Asghar to

4    the effect of, I'm going to meet with so and so from the

5    Choudhry family, and then shortly thereafter an eyewitness

6    will say, I saw members of the Choudhry family standing over

7    his body, something like that --

8              THE COURT:  Poking him with a rifle.

9              MS. HECTOR:  That that would be independent

10   corroborating evidence that those people sort of also acted

11   with an intention to meet Asghar or something of that --

12             THE COURT:  What is your response to that, counsel,

13   this testimony that's apparently going to be elicited that

14   says there were Choudhry family members poking the bodies with

15   AK-s?

16             MR. SOSINSKY:  I've read the government's proffer

17   that there was a member of the family who was doing that and

18   who was apparently, according to eye witnesses, one of the

19   shooters.  The statement of future intent I think that we're

20   discussing is one that takes place regarding a meeting much

21   earlier in the day, that is a meeting that was supposed to

22   have taken place at --

23             THE COURT:  Much earlier in the same day that they

24   show up allegedly poking the bodies with AK-s?

25             MR. SOSINSKY:  Yes.

1          THE COURT:  How much time separation do you need,

2     five minutes, ten minutes, really?

3          MR. SOSINSKY:  Judge --

4          THE COURT:  I mean I think the jury can sort that

5     out.

6          MR. SOSINSKY:  If you're asking, I can respond.

7          THE COURT:  Yes.

8          MR. SOSINSKY:  As I read the government's proffer,

9     it was hours before and in fact, as I understand it, no such

10    meeting ever took place.  In other words, it may be that the

11    witness told someone that they were going to meet with one

12    person and members of the Choudhry family but, as I understand

13    it, I don't think there's evidence that in fact anybody was

14    there and that was hours earlier before the shooting.

15         In addition, another statement that they wish to

16    offer is a statement --

17         THE COURT:  Let's go back to the hours point.  You

18    make it sound as if hours is a vast separation.

19         MR. SOSINSKY:  Judge, I'm answering your question.

20    Your Honor will decide.

21         THE COURT:  No, my question was is if you think

22    hours is too much, is it a question of minutes?

23         MR. SOSINSKY:  I think -- my argument is that under

24    these circumstances, hours is too much and should prevent Your

25    Honor from making that ruling.

24

1          THE COURT:  It's got to be a 60 minute man rule, is

2     that what you're saying?  I'm just trying to get a sense of

3     what you're saying in terms of the time gap between the threat

4     and the poking with the AK-s; one hour, two hours, three

5     hours?

6          MR. SOSINSKY:  As I've mentioned, it's not simply

7     the temporal objection, Your Honor.  There are other events

8     that took place.

9          THE COURT:  I'm asking about the temporal objection.

10          MR. SOSINSKY:  You're only asking now about the

11     temporal objection?

12          THE COURT:  Yes, for the third time, how much time

13     is enough time?

14          MR. SOSINSKY:  How much time is enough time so as to

15     permit, is that -- I want to be clear on what you're asking

16     me, Judge.  How much time -- if the intent --

17          THE COURT:  I'll make this very clear.  Somebody

18     says, I'm going to kill a relative; somebody says, I'm going

19     to meet up and do it in three hours or two hours or one hour,

20     and then it happens, now I'm just trying to get a sense of

21     what your timetable is for it being too remote in time.

22          MR. SOSINSKY:  Okay.  First of all, that's not the

23     evidence in the case.

24          THE COURT:  It's a hypothetical.  Can you deal with

25     my hypothetical?  Will you humor me.

25

1      MR. SOSINSKY:  Addressing your hypothetical.

2      THE COURT:  Yes.

3      MR. SOSINSKY:  If the statement of, in that case,

4  the declarant was, I'm going to meet someone to kill them, and

5  then later that same day there's witnesses who see them

6  killing him, then I would agree with you that it would be far

7  less important how close in time, especially since the person

8  didn't specify when it was that they supposedly went.

9      THE COURT:  So, 24 hours would be okay?

10     MR. SOSINSKY:  It would depend on what other proof

11  there was in the case.  If, for example, there were -- it was

12  offered before you that there were other intervening

13  individuals who came in contact with the person who might

14  have had interest in causing them harm, that would be I hope

15  something the Court would consider.

16         Getting back, if I could, to this case, I think here

17  this is --

18     THE COURT:  We haven't left this case but that's

19  okay, go ahead.  I don't want you to think we've left this

20  case in answer to the hypothetical.  Go right ahead.

21     MR. SOSINSKY:  Getting back to the offer that was

22  made by the government, it was not a statement made by someone

23  saying, I'm going to kill someone later today.  It was a

24  statement made by a victim of a shooting saying, I'm going to

25  meet members of a family at a particular time at a particular

1    location.  As I understand it, that meeting did not take place

2    and it was scheduled to be hours before.

3           Thereafter, a second offer by the government is

4    that the witness then said or told somebody, it may or may

5    not be the same person to whom the first statement was made,

6    I'm going to be going to pick up my daughter or we're going

7    to be picking up my daughter from school, another event at

8    another -- at a later time that in fact takes place and it is

9    after that second event, okay, takes place that the shooting

10   takes place.

11          THE COURT:  And what happens as a result of the

12   shooting?

13          MR. SOSINSKY:  The person was killed.

14          THE COURT:  Okay.

15          MR. SOSINSKY:  That's what I'm saying, he's a victim

16   of the shooting, the victim of the shooting -- I'm just laying

17   out I think the chronology that leads to the person's death

18   and arguing to Your Honor, and if Your Honor doesn't accept it

19   I respect your ruling, that it was, you know, somewhat remote

20   in time and in fact, in terms of the trustworthiness or the

21   independent corroboration, which is one of the issues that the

22   government just offered, if the meeting doesn't take place, I

23   think that's important for the Court to weigh in evaluating

24   whether or not to admit such a statement.

25          THE COURT:  I was just trying to get your

1  understanding or your articulation of what you mean by

2  remote in time and I have that now.

3          MR. SOSINSKY:  I never said it was days or weeks.

4          THE COURT:  No, I understand what you did say.

5          MR. SOSINSKY:  I'm making arguments that I can,

6  I hope.

7          THE COURT:  Well, you can always make arguments to

8  this Court, they're more than welcome.

9          MR. SOSINSKY:  Thank you.

10          THE COURT:  Absolutely, absolutely.

11          Okay.

12          MS. HECTOR:  Your Honor, and we would just suggest

13  that since this is a factually specific inquiry, you know, if

14  defense counsel wants to re-raise this when the witness is

15  testifying and we can discuss it at that time, that's also --

16  the government would be happy to do that.

17          THE COURT:  Okay.

18          MR. SOSINSKY:  I assume when I have the 3500

19  material, I'll have a more informed basis to make such a

20  further application to the Court, Judge.

21          THE COURT:  I make no assumptions when I try cases,

22  I didn't as a lawyer, try not to do it as a judge, but you'll

23  have what you have when you get it.

24          MS. HECTOR:  I believe the next issue, Your Honor,

25  is the expert testimony and I'm going to let my colleague,

1    Mr. Tucker, address that.

2            MR. TUCKER:  Your Honor, I believe there were two

3    issues raised by defense counsel's submission on this point of

4    June 4th.  The first related to timing and I believe, and I

5    don't want to speak for Mr. Sosinsky, I believe we've resolved

6    that through Your Honor's adjournment of the trial by one

7    week.

8            THE COURT:  I must say I was a little bit nonplussed

9    by the late in the day nature of the disclosure of the expert.

10   I am prepared to believe that perhaps you only decided to go

11   with this expert recently but this question of remoteness in

12   time applies to many issues in this case and, well, I only

13   practiced law for 33 years but I always had a response when

14   people popped experts on me on the eve of trial and luckily

15   you won't have to be the brunt of that but I'm glad to see

16   that you worked it out because I wasn't very happy about that.

17   So, you've agreed on the timetable.

18           Let me ask defense counsel, are you going to get

19   your own expert to counter their expert?

20           MR. SOSINSKY:  I've already reached out and I hope

21   today or tomorrow we'll have that issue settled in terms of

22   having someone capable of reviewing the information and

23   assisting us and in the event that we intend, or that it is

24   likely that we intend then to bring this person in, I will, of

25   course, provide the government with notice.  If we're simply

1  going to be consulting with this person, then I won't because

2  it will be irrelevant for trial purposes.

3       THE COURT:  Right, but if you are going to bring

4  them in as a witness at the trial, my question to you is when

5  do you anticipate informing the government of that?

6       MR. SOSINSKY:  Certainly, Your Honor, this week and

7  I hope even by the middle of this week and it will be somebody

8  well known to the government if it is the person that we've

9  reached out to already.

10       THE COURT:  So, you'll make that identification on

11  ECF and that will be a matter of public record just so we're

12  not playing hide the ball, I mean more than you're allowed to

13  play hide the ball from one another; yes?

14       MR. SOSINSKY:  Yes.

15       THE COURT:  Okay.

16       MR. TUCKER:  Your Honor, just related basically,

17  so that we have a perfectly clear record, I understand the

18  Court's ruling as having denied defense counsel's motion to

19  preclude the government's expert?

20       THE COURT:  I'm denying the defense motion to

21  preclude the government expert but I'm also urging the

22  government to be perhaps in this case and in others a little

23  bit more time sensitive with respect to identifying experts

24  and providing reports and I'm also urging the defense counsel

25  to be as forthcoming as you can be with respect to the

1  identification of your expert and whether or not your expert

2  will be testifying.

3          MR. TUCKER:  Understood, Your Honor.

4          THE COURT:  All right.

5          MR. SOSINSKY:  Yes.

6          Okay.  I wasn't aware until just now that Your Honor

7  had already decided to deny not on the notice issue, which we

8  did take care of, but on evidentiary issues the proffer of the

9  government expert.

10          THE COURT:  Yes, I'm denying the defense objection

11  to it and it will come in.

12          MR. SOSINSKY:  Okay.

13          MS. HECTOR:  I believe we have only one remaining

14  issues and my colleague, Maggie Gandy, is going to address

15  that.

16          THE COURT:  Yes, Ms. Gandy.

17          MS. GANDY:  Yes, Your Honor.  We wanted to make

18  a brief record regarding the history of plea negotiation

19  discussions that have happened in this case.  They certainly

20  have not been extensive but we did make clear to counsel, who

21  as Your Honor knows is the second attorney on the case, that

22  prior to our presentation of evidence regarding the first

23  superseding indictment to the grand jury we did speak to prior

24  counsel about whether or not there was any interest in a

25  possible resolution on the case.

1          Counsel at the time made clear to us that his client

2    would, if interested in anything, would be interested in

3    something in the ballpark of a 24 month recommendation on

4    sentencing.  We made clear that our position would be, and

5    again this is on the original indictment, that we would be

6    advocating for something at or near the statutory maximum.

7    Obviously it was a far spread away from what the defendant was

8    interested in potentially at the time.

9          So, we made that clear to current counsel that that

10   conversation, although an informal conversation, there was no

11   plea agreement, written proposal ever presented, was made to

12   prior counsel and we've made clear to current counsel that if

13   there's any interest in a conversation regarding a possible

14   disposition at this point, he should raise that with us as

15   soon as possible.  We'd be happy to have a conversation at

16   least, although, as I've said, no formal plea offer has ever

17   been made by the government.

18          THE COURT:  Just one point of clarification

19   addressed to both counsel, I know that Mr. Dratel has been

20   on the silken road since leaving this case and Bitcoin but

21   did he formally withdraw as counsel in this case?

22          MR. SOSINSKY:  Your Honor, he made application and

23   Your Honor granted it.

24          THE COURT:  Okay.  I just wanted to make sure that

25   we've had that happen because I did remember seeing his name

32

1    show up at least on service lists.  So, he has withdrawn from

2    the case.

3              MR. SOSINSKY:  Yes, I think back in November of last

4    year.

5              THE COURT:  Okay, that's fine, just as long as he's

6    out and you're in.

7              With respect to what they just said, any comments?

8    You don't have to.

9              MR. SOSINSKY:  Yes, I mean at this point what I can

10   say is this came up really for the first time between us, that

11   is between myself and the government towards the end of last

12   week when I asked the government whether or not they had ever

13   expressed, you know, more formally what their position

14   previously had been, meaning historically, not as of that

15   moment, because obviously I had been given the file by

16   Mr. Dratel, spoken briefly about it with him, spoken with my

17   client a lot and it was not clear to me, based on anything I

18   ever looked at either, that the government's position on

19   resolution was communicated in a way that my client understood

20   and appreciated and that could potentially be an issue.

21             We discussed the fact that if Mr. Choudhry was

22   interested now, and one would think in the past, about taking

23   a plea, that there were opportunities for his prior counsel,

24   as there would have been for me, to discuss this with the

25   government but we also did agree that we would have further

1  discussions about that issue, not about a plea offer but about

2  this specific issue about what, if any, discussions there have

3  been and, hence, today's on the record discussion.  That's how

4  it came up in the first instance was me expressing to the

5  government that I'm not sure my client had any understanding

6  of whatever they say transpired informally other than that it

7  wasn't going -- that nothing like what Mr. Dratel had proposed

8  apparently was going to occur.

9         MS. HECTOR:  Your Honor, we would just note to make

10 the record absolutely clear on this, the defense counsel seems

11 to be making sort of equivocal statements about whether a plea

12 offer was communicated or whether plea discussions were had

13 with -- and, again, we're not saying that a formal plea offer

14 was ever made to the defendant.  This discussion occurred with

15 previous counsel.  But I'm a little concerned about the

16 equivocal comments about whether those discussions were ever

17 communicated to the client, the defendant, and I'm not sort of

18 hearing one way or the other whether they were or were not but

19 I just want to make clear that the government has said to

20 defense counsel that if he believes there's an issue there,

21 defense counsel should alert the government of a potential

22 issue.

23        THE COURT:  Just to make it clear --

24        MS. HECTOR:  And I've not heard yet there is an

25 issue.

1      THE COURT:  Just to make it clear, I'll ask defense

2  counsel, is it your understanding that there were informal

3  discussions with your predecessor counsel about a plea?  I'm

4  asking you.

5      MR. SOSINSKY:  Right.

6      THE COURT:  What is your understanding?

7      MR. SOSINSKY:  Essentially what the government has

8  said, meaning that there was a one-time conversation either

9  outside the courtroom or in their office, and it was brief,

10  Mr. Dratel sort of outlined what he would like.  The

11  government let him know that nothing like that was working,

12  although apparently it would have -- an agreement would have

13  allowed both parties to make arguments to the Court framed by

14  statutory minimums and maximums and that was the total extent

15  of my understanding of what interaction ever took place

16  between Mr. Dratel and the government.

17      THE COURT:  Now, with respect to Mr. Dratel's

18  communication with your client, is it your understanding that

19  he did communicate that offer, is it your understanding that

20  he did not communicate that offer, or is it your understanding

21  that you do not know whether he communicated that offer?

22      MR. SOSINSKY:  Well, it's my understanding that he

23  certainly communicated to the defendant that a sentence that

24  low and, as I understand, even lower than that was not going

25  to be agreed to by the government.  My concern and the reason

1  I raised this last week was there's a lot left between that

2  and where else the government would have been willing to agree

3  to and then ultimately leaving it up to the Court and on

4  that -- and I told them I would address this in the next few

5  days and I will.

6          THE COURT:  Just so we're absolutely clear because

7  whatever the situation with Mr. Dratel was or wasn't, he's

8  out, you're in.

9          MR. SOSINSKY:  Yes.

10         THE COURT:  To the extent that there are plea

11 negotiations between the government and the defendant, you

12 obviously will communicate that because that's obviously

13 what's important, correct, at this point?

14         MR. SOSINSKY:  And it's for that reason that I

15 brought it up with them last week.

16         THE COURT:  I'm talking about now, not last week but

17 now, to the extent that anything is communicated to you, you

18 will bring it to your client.

19         MR. SOSINSKY:  Always, always, yes.

20         THE COURT:  Okay.  Now, is there anything that

21 you're going to be communicating to the defendant between now

22 and the start of trial that we should just know that the lines

23 of communication are open or does the government wish to say

24 anything about that at all because I don't really want to get

25 bogged down in the last war, I want to be a good general and

1    learn from the last war and not fight the last war.  So, this

2    is about where we are now.

3            So, where we are now, I'll ask the government?

4            MS. HECTOR:  Your Honor, the government has no

5    comment on that but we take defense counsel's statement that

6    were there to be any discussions, they would be appropriately

7    communicated to his client.

8            THE COURT:  Okay.  Is that your position as well,

9    sir?

10           MR. SOSINSKY:  Of course.

11           THE COURT:  If there are any discussions, you will

12   communicate them to your client and obviously if your client

13   has anything to say to the government, you will communicate

14   that to the government, is that right?

15           MR. SOSINSKY:  Absolutely, sir.

16           THE COURT:  So, if there's anything to communicate,

17   you folks will communicate one to another, right?

18           MR. SOSINSKY:  Yes, sir.

19           MS. HECTOR:  Yes, sir.

20           THE COURT:  Good.

21           What else do we have?

22           MS. HECTOR:  I think that's -- oh, Your Honor, the

23   scheduling order indicated that we would submit questions for

24   voir dire today.  We have spoken to defense counsel about the

25   possibility of conferring on some of those questions and

1  reaching an agreement, so we would ask that, and I think this

2  would be a joint request, that we have a couple of days to see

3  if we can do that so we don't burden the Court with competing

4  voir dire requests.

5          THE COURT:  I don't feel burdened but however you

6  wish to proceed as sophisticated counsel is fine with me.

7          MR. SOSINSKY:  Can we have until Wednesday, Your

8  Honor?

9          THE COURT:  You may have until -- this Wednesday?

10         MR. SOSINSKY:  Yes.

11         THE COURT:  It's old school, when people say can we

12  have till Wednesday and then it turns out to be some other

13  Wednesday.

14         MR. SOSINSKY:  Now that Your Honor has agreed that

15  next Monday we're going to pick the jury, so we better get it

16  to you this Wednesday, not the following Wednesday.

17         THE COURT:  Well, I realize that but I've seen

18  lawyers say, well, we didn't say what Wednesday and then I

19  feel more foolish than I ordinarily do which is foolish

20  enough.  All right.  This Wednesday.

21         Can we pick a time, let's say 5:30 p.m. on ECF, does

22  that work for you ladies and gentlemen?

23         MS. HECTOR:  Thank you.

24         MR. SOSINSKY:  Certainly.

25         THE COURT:  Is there anything else that we need to

1  talk about?

2          MR. SOSINSKY:  I will be submitting via ECF later

3  today an application for Your Honor to sign so that my client

4  is properly attired here at trial.

5          I've been in communication with the MDC about this

6  and hopefully we don't have to think about that after it's

7  served upon them.

8          THE COURT:  That's absolutely not a problem,

9  although I once had a lawyer say that everything was fine

10  except his client didn't have shoes and I pointed out that

11  that's why God made Fulton Street and I gave him a time to go

12  out and buy shoes, but hopefully soup to nuts, head to toe

13  everything will be worked out in the haberdashery land but I

14  am not the glass of fashion, I always wear this basic black

15  and there you have it.

16          Is there anything else?

17          MS. HECTOR:  No, Your Honor.

18          MR. SOSINSKY:  No, Judge.

19          THE COURT:  Thank you.

20          Mr. Jackson, we need to exclude time.

21          THE COURTROOM DEPUTY:  Yes, Judge.

22          THE COURT:  He gave me the need to exclude time

23  face.

24          So, we will exclude time to and including the

25  beginning of the trial.  Is that right, Mr. Jackson?

1          THE COURTROOM DEPUTY:  That's correct, Judge.

2          THE COURT:  What date are we going to put in for the

3  exclusion of time?

4          COURTROOM DEPUTY:  6/6 to 6/23/2014 because of the

5  decision you entered last Friday.

6          THE COURT:  6/23/2014.

7          We will ask counsel to sign that and also the

8  defendant if he's willing to sign that as well.

9          We'll make that Court Exhibit One in evidence when

10  it's been signed by everyone including the judge.

11          (Pause.)

12          THE COURT:  Thank you.

13          I have what has been marked as Court Exhibit One for

14  identification, the waiver of speedy trial and order of

15  excludable delay form extending time from today's date,

16  June 6 -- sorry, it says today's date -- extending it from

17  June 6 of 2014 to and including June 23rd of 2014.  It's been

18  signed by counsel but I don't see -- has the defendant signed

19  it?

20          THE COURTROOM DEPUTY:  Yes, Your Honor.

21          THE COURT:  Okay.  And the prosecution.  I'm signing

22  it now.

23          May I have a motion to have it admitted into

24  evidence please?

25          MS. HECTOR:  Yes, Your Honor, so move.

40

1          THE COURT:  Any objection?

2          MR. SOSINSKY:  No, sir.

3          THE COURT:  It's admitted.

4          Here you are, Mr. Jackson.

5          THE COURTROOM DEPUTY:  Thank you, Judge.

6          THE COURT:  It will be part of the record.

7          Is there anything else?

8          MS. HECTOR:  No, Your Honor.

9          MR. SOSINSKY:  Nothing further, Your Honor.

10          THE COURT:  Thank you.  We are adjourned.

11          MS. HECTOR:  Thank you.

12          (Time noted:  11:45 a.m.)

13          (End of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25