

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AL:AH/RMT/MEG
F.#2013R00312

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 4, 2015

By Hand Delivery and ECF

The Honorable William F. Kuntz, II
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Mohammad Ajmal Choudhry
                Criminal Docket No. 13-150 (S-2) (WFK)

Dear Judge Kuntz:

      On July 3, 2014, following a jury trial held before the Court, the defendant Mohammad Ajmal Choudhry was found guilty of one count of conspiracy to commit murder outside of the United States, in violation of 18 U.S.C. §§ 956(a)(1) and (a)(2)(A), one count of making a false statement on a United States I-130 Petition for Alien Relative, in violation of 18 U.S.C. § 1546(a), and one count of communicating threats in interstate commerce, in violation of 18 U.S.C. § 875(c). The defendant is scheduled to be sentenced on May 7, 2015. Under the United States Sentencing Guidelines ("U.S.S.G."), the advisory term of imprisonment for the defendant is life. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of life imprisonment.

I.    Background

      The defendant's first, and most egregious, count of conviction arose from his orchestration of the murder of Asghar Abbas ("Asghar") – a husband and father of five – and his daughter, Madiha Abbas ("Madiha") – a twenty-one year old schoolteacher[1] – who were

---

      [1]    The PSR states that Madiha was twenty years old at the time of her murder (PSR ¶ 12); her sister, Seemab Abbas, however, said in her victim impact statement that Madiha was twenty-one years old when she was killed. The government has adopted the age

shot to death in the streets of the Pakistani village where they lived by members of the defendant's family, and at the defendant's direction. (Presentence Investigation Report ("PSR") ¶¶ 2, 12). While Asghar and Madiha were the only two family members to be killed, the evidence at trial revealed that the defendant had conspired to have five members of the Abbas family murdered in retaliation for Shujat Abbas ("Shujat"), the eldest son, having tarnished the defendant's honor by helping his daughter, Amina Ajmal ("Amina"), flee Pakistan and her arranged marriage. (PSR ¶¶ 8-9). The defendant had arranged Amina's marriage to Ahmed Babar ("Babar") in Pakistan, and, after compelling the reluctant Amina to agree to the marriage by forcing her to remain in Pakistan for a period of years and threatening her life, the defendant filed an application seeking lawful immigration status for Babar in the United States that falsely purported to have been completed by Amina. (PSR ¶ 6). These actions gave rise to the second count of conviction (making a false statement on a Petition for Alien Relative). (PSR ¶ 3).

The strength of the defendant's conviction to kill the Abbas family to avenge his honor was apparent when he told Amina, during a recorded telephone call four days before the murders, "I will lay down three of their bodies. I'll pick three of them if you do not come back. As long as you're outside the home, my honor is at stake. If you come back home, then everything will be fine. If I survive, I will live. Getting humiliated and living is not a life." (Gov't Ex. 105 at 13). To that end, for more than two months before Asghar and Madiha were killed, the Abbas family was terrorized by threats of death from the defendant and his family members. (PSR ¶ 10). Asghar's daughter, Seemab Abbas ("Seemab"), conveyed the depth of that fear in her victim impact statement, in which she said, "Every night I went to bed with fear in my mind, terrified that Ajmal's family would find Shujat or kill my parents. I wept silently and asked myself, why is this world being so unfair to me and my family?" (PSR ¶ 13).

On January 26, 2013, members of the defendant's family ambushed Asghar and his wife, Rukhsana Kousar ("Ruksana"), by luring them back to the village and then firing bullets at their car. (PSR ¶ 10). While Asghar and Rukhsana managed to escape the ambush unharmed, they lived in a constant state of fear about the safety of their family from that point forward. (Id.). After the ambush, the defendant issued a threat directly to Asghar during a telephone call in which he warned that Asghar and his family would be killed if Amina did not return to the defendant's family home. (Id.). Seemab testified at trial that she was present for this call and heard the defendant threaten, "If our daughter will not come back to the home, we will kill all five of you, otherwise we will find your son and we'll kill him . . .," and that "[t]his time, we shoot on your car. It was threatening, but next time we will shoot in the chest of all five of you." (Tr. at 129-30).[2] Seemab also described, during her testimony, how she and her family member slept in their storeroom at night in the hope that the large containers of wheat housed there would prevent them from being hit by bullets should the defendant's family attack their home. (Tr. at 134).

---

represented by Seemab.
    [2]    Citations to "Tr." refer to the trail transcript.

2

The third count of conviction arose from the threats to kill the Abbas family that the defendant made in recorded telephone calls with Amina in the days leading up to the murders. (PSR ¶¶ 3, 11). In one such call, the defendant warned, "Now let me make it clear to you. If you don't come back, I will kill each and every one of them. I and the entire family will be held. We will end up in jail." (PSR ¶ 11). Four days after issuing that unequivocal warning, Asghar and Madiha were killed by the defendant's brother Akmal Mohammad Choudhry and others. (PSR ¶ 12). Seemab and her mother witnessed the horror of seeing their loved one's lifeless bodies lying in the street after they had been shot; a gruesome mental image Seemab said she can now never forget: "My father and sister were brutally killed right in front of my eyes. I can never forget that moment." (PSR ¶ 13). Seemab and Rukhsana were themselves forced to run for the lives as the defendant's family members chased them from the scene. (PSR ¶ 12).

II.     The Advisory Guidelines Range

In the PSR dated March 16, 2015, the Probation Department calculated the defendant's total adjusted offense level as 45, and his Criminal History Category as I, based on the fact that he has no criminal history. (PSR ¶¶ 72 and 75). Probation further found the resulting applicable U.S.S.G. term of imprisonment to be life. (PSR ¶ 105). The government concurs with the Guidelines calculations set forth by Probation in the PSR.[3]

III.    Application of the 18 U.S.C. § 3553(A) Factors

   A.   Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant.

---

[3]     In a letter dated April 8, 2015, the government raised objections to the language contained in paragraphs 36, 47 and 60 of the PSR; the changes proposed by the government did not affect the resulting advisory Guidelines term of imprisonment.

3

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B. Discussion

In the defendant's sentencing submission to the Court, he seeks a sentence of probation, with a period of home detention, arguing that it is "sufficient, but not greater than necessary" to meet the goals of 18 U.S.C. § 3553(a). (Def. Ltr. at 21). The government strongly disagrees, and respectfully submits that a Guideline sentence of life imprisonment is the appropriate sentence in this case for the reasons set forth below.

1. The Nature and Circumstances of the Offense

There can be no dispute about the gravity of the defendant's crime; the Abbas family lost their beloved patriarch and their sister in a brutal and untimely manner. The cruelty of the defendant's conduct toward the Abbas family began months before the fateful events of February 25, 2013, and included a campaign of threats and terror that caused the Abbas family to live in fear daily. The tragic consequences of the defendant's actions, and the depth of the suffering endured by the Abbas family because of those actions, are captured poignantly in the victim impact statement that Seemab submitted to the Court. (PSR ¶ 13).

The motivation behind the defendant's fatal decision should also be considered by the Court, as these murders were not orchestrated in a moment of uncontrollable rage, but constituted cold and calculated acts that represented the culmination of months of threats of violence against the Abbas family, all of which were done to achieve the defendant's selfish and unjustified desire to exact revenge on Shujat's family and to restore his honor. As Seemab wrote, "Ajmal tried to restore his honor by killing a young innocent school teacher and her helpless father." (Id.). There can be no doubt that the defendant knew of the potential consequences of his decision to kill the Abbas family and proceeded with the murders anyway from his statement to Amina: "If you don't come back, I will kill each and every one of them. I and the entire family will be held. We will end up in jail." (PSR ¶ 11).

4

Furthermore, while a less serious offense, the defendant's submission of a falsified application seeking lawful immigration status for Babar offers another example of the defendant's willingness to disregard the law to achieve his desired end, thereby suggesting that his participation in the conspiracy to murder Asghar and Madiha was not a complete aberration from an otherwise law-abiding life.

    2.    <u>The Defendant's History and Characteristics</u>

In his sentencing letter to the Court, the defendant argued that he should be afforded the benefit of a below-Guidelines sentence because of his devotion to and support of his family and community throughout his life (Def. Ltr. at 12); his age (Def. Ltr. at 6); and his status as first time offender (Def. Ltr. at 11-12). The government respectfully submits that none of these considerations warrant a departure from the sentence recommended under the Guidelines.

    a.    <u>The Defendant's Devotion to and Financial and Emotional Support of his Family and the Community</u>

It is apparent from the extensive collection of letters of support from family members and friends attached to the defendant's sentencing submission that there are many people who respect and care for the defendant. While the Court can consider the defendant's devotion to his family and friends throughout his life in fashioning an appropriate sentence, these considerations should fall far short of warranting the slap-on-the-wrist punishment he seeks given the heinousness of the crimes he has committed. Indeed, the applicable Guideline policy statement provides in relevant part that, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted," U.S.S.G. § 5H1.6, and the defendant has not demonstrated any extraordinary family circumstances warranting a departure on these grounds.

The defendant also asks the Court to consider "the effect that a lengthy term of incarceration will have on Mr. Choudhry's family." (Def. Ltr. at 12-15). To be sure, there are collateral consequences that negatively impact the families of those who are incarcerated, and the defendant's family is no exception. However, the suffering of the defendant's family is the direct result of the criminal choices he made, and pales in comparison to the suffering endured at the defendant's behest by the Abbas family. Seemab conveyed this suffering by stating, "Ajmal and his family vanished the existence of my family from the surface of the earth. My family is like a body without its heart and brain. My father was the brain of my family who guided us to the right way, and Madiha was the heart of my family. I can never touch my father and sister again." (PSR ¶ 13).

    b.    <u>The Defendant's age</u>

The defendant asks the Court to sentence him to "strict home confinement" in part because he is sixty-two years old, and a lengthy prison term would "likely be a life sentence for Mr. Choudhry." (Def. Ltr. at 6). This argument should be rejected. The

5

applicable Guideline policy statement provides that:

> Age (including youth) may be relevant in determining whether a departure is warranted, if consideration based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

U.S.S.G. § 5H1.1. In support of his request, the defendant posited that "Mr. Choudhry is at an age where his health will invariable [sic] get worse" and that "it seems likely that Mr. Choudhry would emerge, after completing his sentence, in substantially worse shape than he is now." (Def. Ltr. at 10-11). The government respectfully submits that these considerations cannot be characterized as "present to an unusual degree" that "distinguish[es] the case from the typical cases covered by the guidelines." A departure based on the defendant's age is therefore not warranted.

The defendant further supports his argument by citing a litany of cases in which courts (although none from this district or the Second Circuit) departed from the Guidelines based, at least in part, on the defendant's age. (See Def. Ltr. at 7-8). Notably, however, none of the cases cited by the defendant involved defendants who were charged with acts of violence – let alone murder – and many involved defendants whose advanced age was coupled with extreme physical infirmities that are not present here. Consider, for example, the cases that the defendant cited from the Southern District of New York: United States v. Roth, 1995 WL35676 *1 (S.D.N.Y. Jan. 30, 1995) (Sweet, J.) and United States v. Barbato, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002) (Kram, J.). In Roth, the court departed downward because the defendant suffered from ALS, a condition that leads to "profound physical impairment," which the court found to be "an extraordinary physical condition which warrant[ed] a departure," Roth at *1; likewise, in Barbato, the court found that a downward departure was appropriate based on the defendant's age (he was eighty-one years old – nearly two decades older than the defendant here), and his medical condition (he suffered from a variety of serious medical conditions which left him, in the words of his doctors, "totally disabled"), Barbato at *4-5. In contrast, at sixty-two years old, the defendant is not "elderly and infirm." Indeed, the defendant reported to Probation that he had no significant medical problems. (PSR ¶ 87). Nor has the defendant satisfied his burden of showing that the home confinement he proposes is equally efficient as and less costly than incarceration.

        c.        <u>The Defendant's Status as a First-Time Offender</u>

The defendant suggests that the below-guidelines sentence that he proposes is appropriate, in part, because he is a first-time offender, and the crimes of conviction are "so

6

out of character" in the context of the life he has led. (Def. Ltr. at 12, 15). A departure for aberrant behavior is warranted only in an "exceptional case," U.S.S.G. § 5K2.20(a), and may not be applied when the "offense involved serious bodily injury or death." U.S.S.G. § 5K2.20(c)(1). Therefore, to the extent that the defendant suggests that his lack of criminal history is a sufficient basis for an aberrant-behavior departure, the government respectfully disagrees. Furthermore, the defendant's lack of criminal history is, of course, reflected in the sentence that is recommended under the Guidelines, as the defendant was appropriately placed in Criminal History Category I. (PSR ¶ 75). To be sure, the defendant's first foray into deviant criminal behavior falls at the highest end of the spectrum, in that he orchestrated the murder of five people over a period of months, and caused the death of two of them. The government respectfully submits that the sentence sought by the defendant – one of probation and home confinement – is grossly inappropriate even given his status as a first-time offender.

Moreover, the fact that the defendant is likely to be deported upon completion of his sentence, a fact cited by the defendant in his sentencing submission (Def. Ltr. at 6), makes a non-incarceratory sentence impractical, as he may well be held in custody by the United States Immigration and Customs Enforcement during the pendency of his immigration proceedings.

       3.      Reflecting the Seriousness of the Crime, Promoting Respect for the Law, Providing Just Punishment, and Affording Deterrence.

The defendant's request for a sentence of probation and home confinement should be rejected because it does not come close to reflecting the seriousness of the crimes he committed, it would not promote respect for the law, and would not provide just punishment for his actions or have a deterrent effect. The defendant's actions ended the lives of two people and relegated the remaining members of the Abbas family to a lifetime of bereavement. A sentence of imprisonment for the rest of his life for those actions is appropriate. To afford the defendant the benefit of returning to the comfort of his own home and the company of the family that loves him after having served only two years in jail would constitute a gross disparity between the severity of the crimes he committed and the sentence imposed. Indeed, even those members of the Abbas family who survived the defendant's campaign of threats have been denied the ability to return to their home because of the defendant's actions. Seemab conveyed to the Court that "[s]ince my father and sister were murdered, my world has completely changed. I feel like a fish out of water, and am waiting for the moment when I will get my family back. *** My family and I are going through so much hardship now. We cannot go back to our home again . . .."

The government respectfully submits that a sentence of life imprisonment – the sentence recommended under the Sentencing Guidelines – is a just punishment that reflects the seriousness of the defendant's offenses, promotes respect for the law, affords deterrence, and is sufficient but not greater than necessary under the circumstances presented here.

IV. Conclusion

For the foregoing reasons, the government requests that the Court impose a Guidelines sentence of life imprisonment.

Respectfully Submitted,

KELLY T. CURRIE
Acting United States Attorney

By: /s/_____
Amanda Hector
Richard M. Tucker
Margaret E. Gandy
Assistant United States Attorneys
(718) 254-6212/6204/6213

cc: Clerk of Court (by ECF)
Ying Stafford, Esq. (by ECF)
Frank M. Marcigliano, Senior U.S. Probation Officer (by E-Mail)